[Cite as *In re A.S.*, 2022-Ohio-1861.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [A.S.], | : | |
| | : | No. 21AP-249 |
| | | (C.P.C. No. 18JU-5657) |
| [J.S. Mother, | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| In re: [A.S.], | : | |
| | : | No. 21AP-259 |
| | | (C.P.C. No. 18JU-5657) |
| [P.H. Father, | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on June 2, 2022

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for mother J.S. **Argued:** *Timothy E. Pierce*.

**On brief:** *April F. Campbell*, for father P.H.

**On brief:** *Steven Thomas D. Potts*, for Franklin County Children Services. **Argued:** *Steven Thomas D. Potts*.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, J.S., mother of A.S., a minor child, and appellant, P.H., father of A.S., appeal the April 22, 2021 judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody

of A.S. to appellee Franklin County Children Services ("FCCS").  For the following reasons, we reverse.

## I.  Facts and Procedural History

{¶ 2}    On February 15, 2018, prior to the filing of the complaint in the matter before us, FCCS filed a complaint in a separate case alleging that A.S. was a dependent child pursuant to R.C. 2151.04(C).[1]  In the case before us, on May 10, 2018, FCCS filed a complaint in which FCCS alleged A.S. was a dependent child pursuant to R.C. 2151.04(C). On May 14, 2018, the juvenile court magistrate filed an order granting temporary custody of A.S. to FCCS. On May 17, 2018, the magistrate reappointed Brian Herzberger, who previously served as A.S.'s guardian ad litem ("GAL")[2] from his appointment in the prior dependency case, to be A.S.'s GAL effective May 14, 2018.[3]

{¶ 3}    On July 29, 2018, Herzberger filed a GAL report in which he stated he interviewed or contacted the FCCS caseworker, J.S., P.H., and the attorneys for J.S. and P.H.  Herzberger did not state that he visited A.S. or viewed A.S.'s interactions with either

---

[1] Pursuant to Evid.R. 201, a court, including an appellate court, may take judicial notice of a fact not subject to reasonable dispute that is " 'either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *See State ex rel. Brime v. McIntosh*, 10th Dist. No. 19AP-70, 2019-Ohio-4019, ¶ 28, quoting Evid.R. 201(B); *State v. Murphy*, 10th Dist. No. 12AP-952, 2013-Ohio-5599, ¶ 23; *State ex rel. Coles v. Granville*, 116 Ohio St.3d 231, 2007-Ohio-6057, ¶ 20, citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992), quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (citing *Liberty Mut. Ins. Co.* for the proposition that a " 'court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings" ' "). We take judicial notice of the fact that a complaint alleging A.S. was a dependent child pursuant to R.C. 2151.04(C) was previously filed in the juvenile court in case No. 18JU-1801 on February 15, 2018. The juvenile court assigned a magistrate, who granted emergency custody of A.S. to FCCS on the same date. On May 16, 2018, the magistrate filed a decision and entry granting dismissal without prejudice of the complaint and noting that the complaint was being refiled in this case under case No. 18JU-5657.

[2] We note the Rules of Juvenile Procedure define a "[g]uardian ad litem" as "a person appointed to protect the interests of a party in a juvenile court proceeding." Juv.R. 2(O).

[3] We take judicial notice of the juvenile court's March 29, 2018 entry in case No. 18JU-1801 appointing Herzberger to be A.S.'s GAL effective February 16, 2018.

J.S. or P.H. at visitations.  On August 8, 2018, FCCS filed a case plan.4  On July 30, 2018, the magistrate held an adjudicatory hearing on the dependency complaint.  On August 15, 2018, the magistrate filed a decision and entry finding A.S. is a dependent minor child as defined under R.C. 2151.04(C).  On August 31, 2018, FCCS filed a semiannual review.

{¶ 4}  On January 11, 2019, FCCS filed a motion for an extension of temporary custody.  On February 14, 2019, FCCS filed a semiannual review.  On April 23, 2019, the magistrate held a hearing and filed findings of fact and conclusions of law, finding FCCS made reasonable efforts to prevent the continued removal of A.S. from the home.  On April 23, 2019, Herzberger filed a second GAL report, in which he stated he interviewed or contacted an FCCS caseworker supervisor, J.S., P.H., and J.S.'s and P.H.'s attorneys. Herzberger stated in his report that he visited J.S. at the home she shared with P.H. on February 9, 2019.  Herzberger noted in his report that he had not observed visitation between A.S. and J.S., but would schedule a time to observe them forthwith.  Herzberger did not state that he visited A.S. at his placement at the time.

{¶ 5}  On April 25, 2019, FCCS filed an amended case plan, which was approved and adopted by the court on May 6, 2019. Under the amended case plan, J.S. was required to complete the following by January 31, 2020: (1) alcohol and drug assessment, complete random drug screens, and comply with any recommendations from the assessment; (2) successfully complete a mental health assessment, including an assessment of parenting skills and domestic violence, and comply with any recommendations; (3) complete a psychiatric assessment for medication and comply with recommendations; (4) sign all releases of information on request; (5) complete a parenting education program and demonstrate acquired skills with A.S.; (6) comply with rules of probation; (7) attend all visitations; and (8) be available for monthly announced and unannounced contact with FCCS.  J.S. was also expected to be able to meet all of A.S.'s basic needs. Under the same case plan, P.H. was required to complete the following by January 31, 2020: (1) alcohol and

---

4 We note that in the case plan filed August 8, 2018, J.S. was required to maintain housing free from physical hazards supported by a legal source of income sufficient to meet A.S.'s needs; complete alcohol and other drug assessment and follow all recommendations; complete random drug screens through American Court Services; complete a mental health assessment, including an assessment on parenting skills, and follow all recommendations; complete an assessment for domestic violence and follow all recommendations; sign all releases of information requested by FCCS; be available for announced and unannounced home visits; and attend all scheduled visitations with A.S. In the same case plan, P.H. was required to establish paternity and establish a relationship with A.S.

drug assessment, complete random drug screens, and comply with any recommendations from the assessment; (2) successfully complete a mental health assessment and comply with any recommendations; (3) sign all releases of information on request; (4) complete a parenting education program and demonstrate acquired skills with A.S.; (5) maintain stable housing and income for his family, including providing proof of housing, utilities, and income; and (6) be available for monthly announced and unannounced contact with FCCS. P.H. was also prohibited under the terms of the case plan from having any future incidents of domestic violence. On May 6, 2019, the magistrate filed an entry granting FCCS's motion for extension of temporary custody and adopting the April 25, 2019 amended case plan as an order of the court.

{¶ 6} On July 5, 2019, FCCS filed a motion for a second extension of temporary custody. On August 1, 2019, the magistrate held an annual review hearing at which the July 5, 2019 motion for a second extension of temporary custody was dismissed and the court sua sponte granted a second extension of temporary custody. At the August 1, 2019 hearing, the magistrate required Herzberger to file an updated GAL report, noting that "a report does need to be filed with the [annual] review." (Aug. 1, 2019 Tr. at 8-9.) On August 2, 2019, Herzberger filed a third GAL report. In his third report, Herzberger stated he had previously interviewed or contacted J.S., P.H., and an FCCS caseworker supervisor. Herzberger did not describe the nature of his contacts with any of the individuals listed in the report or otherwise note he had observed A.S. at his placement at the time or with either P.H. or J.S. at visitations.

{¶ 7} On September 5, 2019, FCCS filed a semiannual review. On December 10, 2019, FCCS filed a motion for permanent custody[5] of A.S. pursuant to R.C. 2151.413, 2151.414, and Juv.R. 14 and 19. On January 27, 2020, Herzberger filed a fourth GAL report. On March 17 and September 23, 2020, FCCS filed semiannual reviews. On October 9, 2020, the juvenile court held a pretrial hearing on the motion for permanent custody. On November 5, 2020, the juvenile court filed a pretrial order in which it ordered Herzberger to file a GAL report on or before seven days prior to the hearing on the permanent custody

---

[5] "Permanent custody" is defined as "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations." R.C. 2151.011(B)(31).

motion and to comply with *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 47-48, Sup.R. 48(D), Loc.Juv.R. 27, and R.C. 2151.281.

{¶ 8} On January 26, 2021, the juvenile court held a second pretrial hearing on the December 10, 2019 motion for permanent custody. At the second pretrial hearing, the juvenile court reminded Herzberger that he needed to update the GAL report and noted some children as young as A.S. were able to express their own wishes regarding placement. On February 4, 2021, Herzberger filed a final GAL report. In his report, Herzberger stated his last contact with J.S. was in February 2020; he attempted to contact J.S. by telephone three times in February 2021, but had not received a response. Herzberger stated he contacted P.H., but did not provide the date for the contact. Herzberger observed A.S. with his current foster caregiver via videoconference, but did not provide a date for the contact or state that he spoke with A.S. outside of the presence of the foster caregiver. Herzberger did not state in his report that he observed A.S. with either J.S. or P.H. at visitations.

{¶ 9} On February 11, 2021, the juvenile court held a hearing on FCCS's December 10, 2019 motion for permanent custody. At the hearing, Luann Layman, a social worker for FCCS, testified that she had been assigned to A.S.'s case since December 31, 2018. According to Layman, A.S. had not been in either parent's custody since February 14, 2018, approximately two months before A.S.'s first birthday. On that date, police responded to an emergency at J.S.'s home. Police found J.S. to be mentally unstable and, as a result of the disturbance, removed A.S. from the home and placed A.S. in FCCS's custody.

{¶ 10} For the next eight months following the disturbance, A.S. was placed with C.S., A.S.'s half-sister. Due to C.S.'s inability to meet A.S.'s special needs, A.S. was removed and placed in a treatment foster home for approximately six months. The foster parents were unable to safely meet A.S.'s behavioral and developmental needs while keeping their other foster children safe, so A.S. was moved to a second treatment foster home. At the time of the permanent custody hearing, A.S. continued to reside at the second foster home, where he had been for approximately one year and nine months. A.S.'s current foster parents were interested in adopting A.S. if adoption became available.

{¶ 11} Layman testified that A.S. was very attached to and bonded with everyone in his current foster home. A.S. did not ask Layman about J.S. or P.H. According to Layman,

A.S. was having all needs met and doing very well in his current foster home. Layman attributed this in part to A.S.'s natural growth and development over time, but also because of the structure in the foster home and the additional services A.S. was receiving.

{¶ 12} According to Layman, A.S. knew who his parents were. A.S. was particularly excited to see P.H. at visitations. A.S. responded well to P.H. because P.H. was very joyful and happy with A.S. Layman testified there were many times A.S. was happy to see J.S. at visitations. However, A.S. also sometimes struggled with J.S. or was more reserved during visitations with J.S. because of her demeanor. Layman did not believe there was much of a bond between A.S. and either J.S. or P.H., other than A.S.'s knowledge of who they were.

{¶ 13} Layman testified that several services are linked for A.S., including trauma focused counseling, occupational therapy, and Help Me Grow through his school to participate in a special needs preschool. He is also linked with the county developmental disabilities board. Layman testified A.S.'s diagnosis is basic as he is only three years old, but he has developmental delays and is a little behind on speech. Layman testified she did not know how many doctors or therapy appointments P.H. was invited to and that she never notified him of any such appointments. Layman further testified that A.S. gets occupational therapy at school and special needs services at preschool, and "[h]e would have been invited to all of the school appointments" by the school. (Feb. 11, 2021 Tr. at 188.) It was determined A.S. did not need physical therapy or speech therapy although they are monitoring his speech. The occupational therapy is not an appointment but, rather, "something that happens in conjunction with his special needs preschool. It's not for a parent to attend." (Feb. 11, 2021 Tr. at 192.) A.S. also had difficulty regulating emotions, especially when upset, which resulted in dangerous or damaging actions such as "throwing himself down and banging his head or even banging his [head] full force into a wall." (Feb. 11, 2021 Tr. at 141.)

{¶ 14} Layman testified that J.S.'s case plan was designed to address concerns related to drugs and alcohol, mental health, appropriate parenting, and meeting A.S.'s needs. Layman stated that J.S. had not successfully maintained compliance with any portion of the case plan for an extended duration. J.S. had started many of the services, but had been inconsistent with providers. J.S. also failed to take drug and alcohol screens or otherwise maintain sobriety. Layman stated that J.S. had been linked with sufficient

resources to comply with case plan objectives but had not consistently availed herself of those resources to maintain compliance. From April 2018 to January 2020, J.S. had completed 38 of 151 alcohol and drug screens. Of the 38 completed screens, 25 screens were positive for marijuana, and several screens reflected irregular creatinine levels.

{¶ 15} J.S. completed several assessments, including drug and alcohol assessments at mental health providers, but did not regularly comply with recommendations from such assessments. When the case plan was adopted, J.S participated in psychiatric services with Lower Lights. J.S. also participated in counseling services at Concord Counseling, but was discharged from the program without successful completion in March or April 2019 after approximately three to four months. J.S. participated in comprehensive services at Ohio Guidestone beginning in January or February 2020 and was discharged from the program without successful completion in March 2020. J.S. began participating in services at Access Ohio in May 2020 and remained with them at the time of the permanent custody hearing. J.S. was compliant overall with the program except for some gaps in contact for weeks at a time.

{¶ 16} Layman testified that J.S. was generally consistent in providing releases, staying in contact with Layman, and participating in visitations with A.S., with several notable exceptions. Overall, Layman described J.S.'s behavior during visitation as appropriate. There were times that FCCS staff approached J.S. about smelling of alcohol during visits. However, even in those instances where she smelled of alcohol, J.S. generally did not display combative or erratic behavior, or otherwise behave in a way that would necessitate FCCS ending the visitation. J.S. responded appropriately to A.S.'s behavior, including by getting on the floor to prevent A.S. from being hurt by headbanging or by throwing himself on the floor. FCCS staff worked with both J.S. and P.H. to educate them about A.S.'s behavior.

{¶ 17} In 2018 and early 2019, J.S. was consistently visiting A.S. every week. At the end of 2019, J.S. missed several visitations, resulting in her seeing A.S. approximately every other week. In recent months before the permanent custody hearing, there had been challenges with providing releases and participating in meetings due to J.S.'s housing instability. J.S. stopped coming to visitations at FCCS's offices after a visitation on November 5, 2020. At that visitation, J.S. arrived late and smelling of alcohol. J.S. was very

hostile with FCCS staff and aggressive toward P.H. J.S. voluntarily agreed to leave the visitation and then did not return at the next scheduled visitation. FCCS removed J.S. from the visitation schedule with A.S. on January 5, 2021; J.S. did not participate in another visitation until February 2, 2021. On February 2, 2021, J.S. participated in a virtual visitation with A.S. and FCCS staff via videoconferencing technology. Layman described the visitation as challenging due to technical difficulties. J.S. ended the visit early after 10 to 15 minutes.

{¶ 18} Layman testified that J.S. had been living with P.H., who had been paying for housing in a series of residences. There were other issues related to stability of J.S.'s housing, including break-ins and "domestic concerns" which sometimes resulted in either P.H. or J.S. leaving the residence for a few days at a time. (Feb. 11, 2021 Tr. at 159.) At the time of the permanent custody hearing, J.S. no longer resided with P.H. and was homeless. Layman testified that J.S. failed to complete the parenting course as required by the case plan. Layman opined that J.S. had not demonstrated good parenting because, although it was clear she loved A.S., J.S. was unable to consistently demonstrate that she was able to meet both her and A.S.'s needs in part due to ongoing concerns with mental health and sobriety.

{¶ 19} Next, Layman testified regarding P.H.'s compliance with his case plan requirements. P.H. completed a drug assessment and screenings, which were required due to his admitted use of marijuana. According to Layman, there were domestic dispute concerns involving P.H., including situations in which he was the aggressor as well as situations in which he was the victim. P.H. was required to participate in a mental health assessment, attend counseling, and comply with any recommendations from the counseling. P.H. had been inconsistent with attending counseling; he attended two to three months of appointments, but had not successfully completed any program. P.H. had not established himself enough with a provider to determine if they would make a recommendation for him to have additional domestic violence specific counseling. P.H. completed the required parenting course.

{¶ 20} Layman received a voicemail from P.H.'s mother informing Layman that P.H. was obtaining new housing on or about February 5, 2021 and providing her with the address. Layman did not learn that P.H. had actually secured housing until the date of the

permanent custody hearing. According to Layman, P.H. was very consistent in attending visitations with A.S., missing a minimal number of visitations. When FCCS permitted, P.H. participated in two visitations by videoconference during the COVID-19 restrictions.[6] P.H. was responsive to A.S.'s special needs during visitations. Layman testified she talked with P.H. and J.S. and worked through some of A.S.'s acting out behavior and headbanging. In response to a question whether P.H. and J.S. "do a pretty all right job of managing the -- the head banging at the visits," Layman testified "[y]es," and "mom did a pretty good job with that, mom and dad both do." (Feb. 11, 2021 Tr. at 157.) She also noted that A.S. is older now and learning some techniques of self-regulation and it is easier to reason with a child of three and one-half than a one or two year old child. When P.H. had the opportunity to spend longer amounts of time with A.S., he would decline those opportunities. P.H. struggled to entertain A.S. for longer than one hour. Layman explained that some of the difficulty with visitations was due to restrictions put into place by the COVID-19 pandemic:

> Things have changed as far as what parents can do in visitation for safety and health of everybody, since we reopened visitation in August of 2020. So there's not a lot -- there's no food and there's nothing brought in from the outside. So it challenges visits, but as a parent, you need to be able to parent your child 24/7.

(Feb. 11, 2021 Tr. at 166.) Layman testified there were concerns with P.H.'s comprehension and cognitive abilities. According to Layman, P.H. disclosed that "he doesn't think like other people think and that he doesn't read well." (Feb. 11, 2021 Tr. at 170.)

{¶ 21} FCCS investigated placing A.S. with a maternal aunt who expressed interest in obtaining custody of A.S. FCCS, in cooperation with Pennsylvania authorities, began a home study with A.S.'s aunt as part of Interstate Compact on the Placement of Children ("ICPC") process. However, A.S.'s aunt declined to move forward with the process. A.S.'s maternal grandparents also began to participate in the ICPC process while they determined whether or not they would be able to care for A.S. In 2020, A.S.'s maternal grandparents moved from South Carolina to Pennsylvania without notifying FCCS. In January 2021, maternal grandmother remained undecided on whether or not she would be interested in pursuing placement.

---

[6] As noted below, FCCS was not able to conduct visits by videoconference from March 16 through August 1, 2020, and due to COVID-19 restrictions did not facilitate any visits between P.H. and A.S.

{¶ 22} Layman testified that A.S. was in need of a legally secure permanent placement. According to Layman, there was never a period of time where FCCS was able to return A.S. to the custody of either parent. A.S. had been in FCCS's custody for over two years. Layman opined that granting permanent custody for purposes of adoption was in A.S.'s best interests because A.S. needed the stability and consistency inherent in a permanent placement. Layman testified that a change to J.S.'s housing circumstances would not alter her conclusion that granting permanent custody was in the best interests of A.S. because J.S. had not completed and maintained the other requirements of the case plan. Layman did not recommend placement with J.S. because J.S. had issues of instability regarding mental health, sobriety, housing, and income in addition to ongoing concerns with J.S.'s ability to parent A.S. and consistently provide for A.S.'s special needs. Layman testified that reunification with P.H. was not recommended because P.H. had only recently achieved sobriety and secured housing. Further, Layman expressed concerns related to P.H.'s mental health or cognitive delays because it impacted P.H.'s ability to meet his own needs independently in addition to complications with A.S.'s special needs and behaviors.

{¶ 23} On cross-examination, Layman testified that prior to the COVID-19 pandemic, P.H. brought clothing, gifts, and food for A.S. at visitations. For a period of time at the beginning of the pandemic, from March 16 through August 1, 2020, FCCS stopped allowing visitation. During that time, FCCS did not facilitate visitation between A.S. and either P.H. or J.S. over videoconferencing because FCCS was not equipped to use videoconferencing technology at the time. FCCS did not establish contact between P.H. and A.S.'s current foster parents. Instead, FCCS mailed pictures of A.S. to P.H. and J.S. at their various residences. P.H. consistently attended visitations both before the pandemic-related restrictions on in-person visitations were implemented and after they were lifted. Once visitations resumed, FCCS provided parents with coloring pages and crayons for visits but did not permit parents to bring items to the visitations.

{¶ 24} Layman testified that P.H. completed all genetic testing and releases of information requested by FCCS. In 2019, P.H. was linked with a mental health counseling service but was terminated from the program for failing to attend sessions. In December 2020, P.H. became reinvolved with mental health counseling. According to Layman, P.H. was scheduled for five counseling sessions, which were held virtually due to COVID-19

pandemic restrictions on in-person counseling sessions. The counseling service cancelled two of the five sessions through no fault of P.H. Of the three sessions he could attend, P.H. attended one full session, participated in about half of one session, and completely missed one session.

{¶ 25} Layman testified that A.S.'s behaviors were challenging although they had become more manageable over time as A.S. learned coping skills. P.H. was sometimes able to help manage A.S.'s behavior and calm A.S. down during visitations. Layman stated it was fairly common for a child of A.S.'s age to be focused on the people around him instead of asking about other people who were not present at the time, such as P.H. and J.S. A.S. currently receives occupational therapy through his school. Layman stated it was possible for P.H. to take A.S. to a special needs school that provided occupational therapy.

{¶ 26} When asked by the court whether there were any concerns with placing A.S. with P.H., Layman testified "[s]imilar concerns [parenting to address and learn A.S.'s special needs and to be able to meet his needs consistently]. He's just newly established a sobriety where he's been clean for a few -- couple months now. Inconsistency with stability with his menta -- mental health or cognitive delays to be able to meet his own needs independently let alone meet a child's needs and to meet the child's needs that has special needs and special behaviors. He's just established housing, but I haven't been able to verify that so that's new. Housing been instable -- unstable for periods of time over these last few years." (Feb. 11, 2021 Tr. at 242.)

{¶ 27} Next, Herzberger testified that he was the GAL both on this case and the prior case involving A.S. that had been dismissed. Herzberger stated he was in compliance with his GAL training requirements and had received training on recent changes to the Rules of Superintendence for GALs. In the course of investigating the matter, Herzberger reviewed all court filings, discovery provided by FCCS, and the case plan. Herzberger had recently spoken with Layman, P.H.'s mother, and P.H., but not J.S.

{¶ 28} Herzberger testified he was not able to observe A.S. with his current foster family in person due to concerns regarding the ongoing COVID-19 pandemic, but was able to participate in a virtual visit with A.S. and at least one of A.S.'s foster parents. According to Herzberger, A.S. appeared to be bonded with one of the foster parents. Herzberger did not observe anything that raised concerns regarding the care A.S. was receiving from the

second foster family. However, Herzberger admitted he did not witness A.S.'s interactions with all the members of A.S.'s foster family.

{¶ 29} Herzberger stated he had been unable to contact J.S. immediately prior to the permanent custody hearing. Herzberger was concerned about J.S.'s inconsistency in complying with the case plan requirements. Furthermore, Herzberger was concerned about J.S.'s ability to respond to A.S.'s special needs and J.S.'s lack of suitable housing.

{¶ 30} Herzberger was able to contact P.H. via videoconferencing prior to the permanent custody hearing. Herzberger virtually viewed P.H.'s new residence, which he described as "wonderful." (Feb. 11, 2021 Tr. at 249.) He stated that the residence looked almost brand new, had several safety features, and would meet both P.H.'s needs and those of a child. Herzberger acknowledged that P.H. was complying with screening requirements, staying in touch with FCCS, and had expressed commitment to playing with A.S. and taking A.S. to the doctor when needed. However, Herzberger believed, just based on his conversations with P.H., that P.H. was not in a position to recognize A.S.'s special needs or to meet A.S.'s needs in general. Herzberger also was concerned with P.H.'s ability to pay for housing considering the cost of his current residence relative to his income. Yet, he also testified that P.H. indicated he planned to apply for Section VIII.

{¶ 31} No family members contacted Herzberger about a potential alternative legal placement. Herzberger had no doubt that both J.S. and P.H. loved A.S. According to Herzberger, A.S. was not able to express any wishes regarding permanent custody or reunification. Herzberger opined that A.S. was in need of a legally secure and permanent placement. As a result, he recommended the court grant the motion for permanent custody.

{¶ 32} On cross-examination, Herzberger admitted he had not visited A.S. when he was in C.S.'s custody. Herzberger also had not observed any of P.H.'s visitations with A.S., either before or after the beginning of the COVID-19 pandemic. Herzberger stated that P.H.'s new residence appeared to have ample space, working utilities, and suitable furniture. Herzberger had no difficulty contacting P.H., and described him as "cooperative and polite." (Feb. 11, 2021 Tr. at 255.) Herzberger stated P.H. might have had some issues with case plan compliance, but observed that P.H. "tried his best as he is able to with the developmental issues that he has." (Feb. 11, 2021 Tr. at 255.)

{¶ 33} Herzberger testified he spoke with J.S. "a fair amount" at the beginning of the case, but did not have frequent communication with her after the adjudicatory hearing in 2018. (Feb. 11, 2021 Tr. at 257.) However, Herzberger admitted that since 2018, he only had two face-to-face conversations with J.S. outside of contact at the court. Herzberger never observed any of J.S.'s visitations with A.S. Herzberger was aware of J.S.'s engagement with services at Access Ohio and stated that his recommendation might have been different if J.S. had been engaging with services earlier in the history of the case.

{¶ 34} Herzberger seemed to suggest to the court that another option was to continue the child in the placement, however the court explained it was not able to grant another extension as it had been almost three years since the complaint was filed. The court ultimately opined it was in A.S.'s best interest for the motion for permanent custody to be granted.

{¶ 35} Next, J.S. testified that A.S. went to live with C.S. upon being removed from her custody. J.S. admitted she was an alcoholic and stated that she was working with her case managers at Access Ohio to address her alcoholism. J.S. stated she had a "license" to allow for use of marijuana, which she admitted to smoking. (Feb. 11, 2021 Tr. at 80.) J.S. testified she would not drink alcohol or use drugs again. J.S. also stated she would never drink around A.S. again. J.S. was diagnosed with bipolar disorder, post-traumatic stress disorder, and anxiety. J.S. planned to receive medication for bipolar disorder after the permanent custody hearing.

{¶ 36} J.S. lived with P.H. at four different residences from the time A.S. was removed until she became homeless, approximately December 2020. At the time FCCS obtained custody of A.S., J.S. lived with P.H. at a residence on Siebert Avenue in Columbus. After leaving the residence on Siebert Avenue, J.S. testified she and P.H. lived at residences on East Main Street, Napoleon Avenue, and Frebis Avenue in Columbus. Although J.S. acknowledged she was unemployed and had been homeless for the last four months, she had funds and was seeking housing. J.S. did not have a driver's license and used buses for transportation.

{¶ 37} At her visitations with A.S., J.S. brought food and toys. J.S. denied ever drinking before visitations with A.S., stating that she only sometimes drank the day before visitation. According to J.S., FCCS did not provide her with notice of A.S.'s appointments

with doctors or return several phone calls. J.S. stated FCCS's decision to temporarily discontinue visitation with A.S. due to the COVID-19 pandemic hurt her ability to bond with A.S. during that time.

{¶ 38} J.S. did not believe Herzberger gained enough information about her to render an opinion, specifically citing Herzberger's single visit to her residence. J.S. stated she believed it was in A.S.'s best interest to be returned either to P.H. or her. When asked whether she was able to have A.S. returned to her on the day of the permanent custody hearing, J.S. stated "[i]f I had a home, absolutely could and I have a team in the city that's unbelievable from churches to doctors that all know each other and have walked a mile with me to get me where I'm at today." (Feb. 11, 2021 Tr. at 303.)

{¶ 39} Next, P.H. testified that he entered into a relationship with J.S. approximately five years before the permanent custody hearing. According to P.H., J.S. had been aggressive toward him and filed domestic violence charges against him. P.H. had never been convicted, but had been ordered to stay away from J.S. P.H. was living with J.S. but was not present when A.S. was removed and placed into FCCS's custody. According to P.H., J.S. was drinking alcohol every day before A.S. was removed and was responsible for causing issues that resulted in their being removed from four different residences. P.H. ended the relationship with J.S. in December 2020.

{¶ 40} P.H. admitted to smoking marijuana with J.S. over the course of their relationship. However, P.H. stated he quit smoking entirely in fall 2020 because his "concern is that little boy need[s] to come home with me; that's my main concern, that little boy." (Feb. 11, 2021 Tr. at 46.) P.H. completed paternity testing, an alcohol and drug assessment, and parenting classes; he was scheduled to participate in counseling with North Central Mental Health following the permanent custody hearing.

{¶ 41} When A.S. was removed by FCCS, P.H. lived with J.S. at a residence on Siebert Avenue. After moving out of the residence on Siebert Avenue, P.H. testified that he lived with J.S. at residences on Mound Street, Napoleon Avenue, and Cleveland Avenue. Thereafter, P.H. stayed with his mother to save money. In February 2021, P.H. moved into a residence with two bedrooms, where he lived by himself. P.H. paid for his own utilities and spent $835 per month on rent. P.H. testified he had received Social Security Disability Insurance ("SSDI") payments for his entire life and was receiving approximately $1,185 per

month at the time of the permanent custody hearing.  P.H. did not have a driver's license and he used buses and taxis for transportation.

{¶ 42} P.H. testified he attended visitation with A.S. every Monday and, prior to COVID-19 pandemic-related restrictions, brought food, toys, and clothing to give to A.S. at visitations.  P.H. used to be able to visit with A.S. for two hours when both he and J.S. attended visitation, but FCCS had reduced his visitation time to one hour after J.S. stopped coming to visitations.  P.H. was unaware of any special needs that A.S. might have, but agreed that A.S. had temper tantrums.  P.H. was uncertain of whether A.S. was in preschool. If he had custody of A.S., P.H. testified he would take A.S. to preschool and would be able care for any special needs A.S. might have.  P.H. also testified that he would get A.S. on Social Security Disability and take him to appointments. Furthermore, if A.S. was returned to P.H.'s custody, P.H. would not allow J.S. to be unsupervised around A.S. until J.S. complied with case plan requirements, including taking prescribed medication and screening for drugs and alcohol.

{¶ 43} On March 16, 2021, FCCS filed a semiannual review. On April 22, 2021, the juvenile court filed a judgment entry granting permanent custody of A.S. to FCCS.

## II.  Assignments of Error

### A.  J.S.'s Appeal

{¶ 44} J.S. appeals and assigns the following four errors for our review:

> [I.] The lower court plainly erred when it failed to apply and enforce R.C. 2151.2187(D) and (I) with respect to the GAL for A.S.
>
> [II.] The lower court plainly erred by admitting the testimony of the GAL.
>
> [III.] Attorneys for Mother J.S. provided ineffective assistance of counsel in violation of her rights under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 10, and 16 of the Ohio Constitution and R.C. 2151.352.
>
> [IV.] The lower court's award of permanent custody to the agency was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

---

7 Given the context, as well as the supporting arguments in J.S.' brief, we believe appellant J.S. is referring to R.C. 2151.281(D) and (I) and analyze the same.

### B. P.H.'s Appeal

{¶ 45} P.H. appeals and assigns the following three errors for our review:

> I. The trial court's decision to grant permanent custody of A.S. to Franklin County Children Services should be reversed, because the record does not support the trial court's finding that A.S. could not be placed with his father within a reasonable time.
>
> II. The trial court's decision to grant permanent custody of A.S. to Franklin County Children Services should be reversed, because it was not in A.S.'s best interest to do so.
>
> III. The trial court's decision should be reversed because the Supreme Court of Ohio's tolling provision extended the time periods required by R.C. 2151.414.

## III. Applicable Law—Parenting Is a Fundamental Right

{¶ 46} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 47} However, the state has broad authority to intervene to protect children from abuse and neglect.[8] *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *Swisher*, 2003-Ohio-5446, ¶ 26.

## IV.  J.S.'s First and Second Assignments of Error—GAL

{¶ 48} In her first and second assignments of error, J.S. argues the juvenile court committed plain error by admitting the testimony of the GAL and by failing to apply R.C. 2151.281(D) and (I) to the GAL.  In the course of our analysis of J.S.'s first and second assignments of error, we will also address P.H.'s arguments raised in support of his first and second assignments of error as they relate to deficiencies in the GAL's reports and testimony.

### A.  Applicable Law and Rules

{¶ 49} R.C. 2151.281, which governs the appointment of a GAL, requires a juvenile court to "appoint a guardian ad litem, subject to rules adopted by the supreme court, to protect the interest of a child in any proceeding * * * held pursuant to [R.C.] 2151.414." R.C.

---

[8] On appeal, a court of appeals will not reverse a juvenile court's determination that it was in the best interest of a child to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence. *L.W.* at ¶ 8. The juvenile court's determination must be supported by clear and convincing evidence. R.C. 2151.414(B)(1). " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 31. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

In conducting its review, a court of appeals must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, a court of appeals must recognize that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8, quoting *In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000).

2151.281(B)(1). R.C. 2151.281(D) governs a court's responsibility regarding the appointment of a GAL and provides as follows:

> The court shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem. The court may fix the compensation for the service of the guardian ad litem, which compensation shall be paid from the treasury of the county, subject to rules adopted by the supreme court.

R.C. 2151.281(I), which governs a GAL's responsibilities and duties, provides:

> The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

{¶ 50} The Ohio Rules of Juvenile Procedure, which were recently amended effective July 1, 2020, provide that a juvenile court "shall appoint a guardian ad litem to protect the interests of a child * * * in a juvenile court proceeding when * * * [a]ny proceeding involves allegations of abuse, neglect, or dependency, voluntary surrender of permanent custody, or termination of parental rights as soon as possible after the commencement of such proceeding." Juv.R. 4(B)(5).[9]

{¶ 51} Article IV, Section 5(A)(1) of the Ohio Constitution provides the Supreme Court of Ohio with general superintendence over all the courts in the state. In accordance with this authority, the Supreme Court originated the Rules of Superintendence for the Courts of Ohio, including the courts of common pleas and the divisions thereof. Sup.R. 1. *See Arlington Bank v. Bee, Inc.*, 10th Dist. No. 10AP-41, 2010-Ohio-6040, ¶ 16; *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 72. The Rules of Superintendence, which were

---

[9] We note that prior to July 1, 2020, Juv.R. 4(B) provided in pertinent part that a juvenile court "shall appoint a guardian ad litem to protect the interests of a child * * * in a juvenile court proceeding when * * * [a]ny proceeding involves allegations of abuse or neglect, voluntary surrender of permanent custody, or termination of parental rights as soon as possible after the commencement of such proceeding." 2019 Juv.R. 4(B)(5).

recently amended effective January 1, 2021,[10] contain certain specified provisions that apply in domestic relations and juvenile court cases where the court appoints a GAL. *See* 2020 Sup.R. 48; 2021 Sup.R. 48.[11]

{¶ 52} The Rules of Superintendence provide a nonexhaustive list of duties that GALs are required to perform. 2021 Sup.R. 48.03(D), which was in effect when Herzberger prepared his final GAL report and testified at the permanent custody hearing, provided the following with respect to the duties of a GAL:

> *Unless specifically relieved by the court*, the duties of a guardian ad litem shall include, but are not limited to, the following:
>
> (1) Become informed about the facts of the case and contact all relevant persons;
>
> (2) Observe the child with each parent, foster parent, guardian or physical custodian;
>
> (3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;
>
> (4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;
>
> (5) Ascertain the wishes and concerns of the child;

---

[10] We have previously noted that "[s]ignificant changes were made" in the January 1, 2021 amendments to the Rules of Superintendence governing GALs, "including the deletion of the GAL's discretion to not perform duties 'unless impracticable or inadvisable' and to 'make reasonable efforts' to perform the duties." *D.E.* at ¶ 73, fn. 15. We further noted the amended rules, in addition to imposing "different and additional requirements," now also "provide the GAL shall perform the duties '[u]nless specifically relieved by the court,' thereby giving the discretion to the court, not the GAL, to determine when it is impracticable or inadvisable to not perform duties and whether the GAL has engaged in reasonable efforts to perform the duties." *Id.* As the GAL in this case was required to comply with the prior version of the Rules of Superintendence until they were superseded by the version as amended effective January 1, 2021, we shall refer to both versions of the rules throughout our discussion. For avoidance of confusion, we shall note all references to the version of the Rules of Superintendence amended effective January 1, 2021 as "2021 Sup.R." and all references to the version in effect prior to the January 1, 2021 amendments as "2020 Sup.R."

[11] We note that under both the present and former versions of the Rules of Superintendence, the rules mandated that the provisions related to GALs "shall apply in all domestic relations and juvenile cases in the courts of common pleas where a court appoints a guardian ad litem" for the child. *Compare* 2020 Sup.R. 48 and 2021 Sup.R. 48.

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

(Emphasis added.) 2021 Sup.R. 48.03(D). 2020 Sup.R. 48(D) provided the following with respect to the duties of a GAL:

(13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:

(a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;

(b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

2020 Sup.R. 48(D)(13). 2021 Sup.R. 48.03(G) provides that a GAL "shall perform responsibilities in a prompt and timely manner." 2021 Sup.R. 48.06 and 48.07 govern the responsibilities of courts appointing GALs and provide that juvenile courts, among other listed duties, "shall review all guardian ad litem reports, written or oral, to ensure that the guardian ad litem has performed those responsibilities required by R.C. 2151.281." 2021

Sup.R. 48.06(B)(2).[12] 2021 Sup.R. 48.07 requires that courts appointing GALs "shall," among other listed duties, "[r]eview all guardian ad litem reports, written or oral, to ensure that the guardian ad litem has performed those responsibilities required by R.C. 2151.281." 2021 Sup.R. 48.07(G).

{¶ 53} In addition to statutory provisions and rules promulgated by the Supreme Court, the local rules of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch also address GAL duties and reports.[13] 2020 Loc.Juv.R. 4(D) provided:

> Duties and responsibilities of appointed counsel and guardians ad litem.
>
> Attorneys accepting appointments to serve as guardian ad litem * * * shall initiate and maintain reasonable contact with their client, *which should be no less than once per month.* The * * * guardian ad litem shall advise his / her client / ward of the client's / ward's rights and the possible consequences of the pending action.
>
> * * *
>
> (1) Upon appointment the * * * guardian ad litem * * * shall make reasonable efforts to become informed about the facts of the case and to contact all relevant persons. The * * * guardian ad litem * * * shall, at a minimum, perform certain basic duties, as warranted by the facts of the case, unless

---

[12] 2020 Sup.R. 48(F) provided in pertinent part:

> A guardian ad litem shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment[:]
>
> (1) In juvenile abuse, neglect, and dependency cases and actions to terminate parental rights:
>
> (a) All reports, written or oral, shall be used by the court to ensure that the guardian ad litem has performed those responsibilities required by section 2151.281 of the Revised Code.

[13] We note the local rules of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch were amended effective February 1, 2021, prior to the filing of the final GAL report in this matter. For avoidance of confusion, we shall note all references to the version of the local rules in effect following the February 1, 2021 amendments as "2021 Loc.Juv.R." and all references to the local rules in effect prior to the February 1, 2021 amendments as "2020 Loc.Juv.R."

impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case.

(a) When the child is of sufficient age to have communicative ability, meet with and interview the child(ren) and ascertain the child's wishes. *Observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present. Be aware of the interaction between the parent and child, and the appropriateness of discipline, conversations, and activities.* Interview both parents if permitted by their counsel. If only one parent is known, attempt to ascertain the identity and whereabouts of the other parent.

(b) Review pleadings and other relevant court documents, and consult with each attorney as to position and issues. File pleadings, motions and other documents as appropriate under the applicable rules of procedure. Review the court file, and request discovery.

(c) Meet with and interview all significant individuals who may have relevant knowledge regarding the issues of the case.

(d) Determine the physical and mental health of the child. Interview medical and mental health providers, and obtain copies of relevant records, including medical and hospital records.

(e) Interview school personnel. Obtain information regarding the child's behavior in school and interaction with parents. Review and obtain copies of the child's school records.

(f) Perform home visits (this may be combined with the interview process). Observe the living conditions of each parent and the child's sleeping arrangements.

(g) Evaluate the necessity, if any, of psychological evaluations or counseling, mental health and / or substance abuse assessments, or other evaluations or tests of the parties and file a motion requesting the same.

* * *

(i) Communicate with the Franklin County Children Services worker, and other direct service providers. Obtain the case history. Confirm whether the child has been removed from

home and the child's adjustment to his/her current placement. Confirm the names, addresses, and telephone numbers of parents and care providers. Determine what services are being provided the parents.

* * *

(k) Ask the care providers for their perceptions of the child's adjustment. Assess the child's developmental level. If the child relates a new allegation of abuse or neglect, immediately call FCCS intake, the caseworker, and the Family Assessment caseworker.

(l) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case.

(m) Be cognizant that the duty of an attorney to his/her client and the duty of a guardian ad litem to his/her ward are not always identical and, in fact, may conflict. The role of the guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian ad litem feels is in the ward's best interest.

* * *

(o) Perform any other investigation necessary and appear and participate in any hearing for which the duties of the attorney or guardian ad litem or any issues substantially within an attorney's or guardian ad litem's duties and scope of appointment are to be addressed.

* * *

(q) Perform all duties and responsibilities in a prompt and timely manner, and, if necessary, request timely court reviews and judicial intervention in writing with notice to parties or affected agencies.

* * *

(s) Maintain a log documenting all work performed, all contact with the child, parties, witnesses, etc., and all telephone calls. Keep accurate records of the time spent, services rendered, and expenses incurred in each case and file an itemized statement and accounting with the court.

(3) Reports and court appearances.

A guardian ad litem shall be present at all hearings pertaining to the child(ren), and shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment. In addition, the following provisions shall apply to guardian ad litem reports: In juvenile abuse, neglect, and dependency cases and actions to terminate parental rights:

(a) All reports, written or oral, shall be used by the court to ensure that the guardian ad litem has performed those responsibilities required by Ohio Revised Code 2151.281.

(b) Oral and written reports may address the substantive allegations before the court, but shall not be considered as conclusive on the issues.

* * *

(d) A guardian ad litem shall be available to testify at the dispositional hearing and may orally supplement the final report at the conclusion of the hearing.

(e) A guardian ad litem also may file an interim report, written or oral, any time prior to the dispositional hearing and prior to hearings on actions to terminate parental rights. Written reports may be accessed in person or by phone by the parties or their legal representatives.

(f) Any written interim report shall be filed with the court and made available to the parties for inspection no less than seven days before a hearing, unless the due date is extended by the court. Written reports may be accessed in person or by phone by the parties or their legal representatives. A copy of the interim report shall be provided to the court at the hearing.

(Emphasis added.)   2020 Loc.Juv.R. 4(D).   Similarly, though with some notable differences, 2021 Loc.Juv.R. 4.1(B) provides:

Duties and Responsibilities of Appointed Counsel and Guardian ad Litem:

1. Attorneys accepting appointments to serve as guardian ad litem * * * shall all be familiar with following and be able to apply them to their practice: Sup. R. 48.01, et seq. * * * and the Court's Local Rules as all may be updated or supplemented from time to time.

2. Attorneys accepting appointments to serve as guardian ad litem, court appointed counsel, or in the dual capacity of both attorney and guardian ad litem, shall:

a) Be knowledgeable of the laws of Ohio, case law, and Ohio Rules of Juvenile Procedure applicable to the cases for which they receive appointments;

* * *

d) Initiate and maintain reasonable contact with their client or ward, *which should be no less than once per month* and shall be done outside of scheduled court hearings;

e) Review all pleadings and other relevant court documents, and request discovery in a timely manner;

f) Communicate prior to and outside of scheduled court hearings with counsel (and unrepresented parties), caseworkers, community supervision workers, and other professionals providing services to their client or ward regarding the issues in the case and resolution of those issues in advance of hearing dates;

* * *

h) Be prepared to discuss outstanding issues and be knowledgeable of the facts of the case at each hearing;

i) File necessary motions and pleadings as needed and in a timely manner;

j) Communicate with all counsel, parties, and court staff regarding scheduling conflicts well in advance of scheduled hearings;

k) Advise their client/ward of the client's/ward's rights and the possible consequences of the pending action;

* * *

3. Attorneys appointed to serve as guardian ad litem or in the dual capacity of both attorney and guardian ad litem, shall perform all duties and responsibilities and comply with all requirements as set forth in Sup. R. 48.01, et. seq.

* * *

5. Repeated failure to maintain contact with client or ward, appear for hearings timely, communicate regarding scheduling conflicts in advance, work to resolve matters outside of scheduled hearing dates, comply with the requirements of Sup. R. 48 (for guardians ad litem) including timely filing of reports, or to personally appear on behalf of the client or ward will result in removal from the guardian ad litem/appointed counsel lists as outlined in Section 4.4 of this Rule.

(Emphasis added.) 2021 Loc.Juv.R. 4.1(B). 2021 Loc.Juv.R. 4.4(A) provides that "guardians ad litem may be removed from any court appointment list(s) with the approval of a majority of the judges of the Domestic Relations and Juvenile Court if, in the estimation of the Court, that * * * [a] guardian ad litem failed to comply with the duties and responsibilities required of them as set forth in the Court's Local Rules, [or] Sup.R. 48 * * * as all may be updated or supplemented from time to time."

## B. Standard of Review

{¶ 54} J.S. failed to object to the admission of the GAL's testimony and report. Therefore, we apply a plain error standard of review in considering whether the juvenile court erred by failing to remove Herzberger as GAL and by admitting his testimony. *D.E.* at ¶ 76; *In re A.L.*, 10th Dist. No. 07AP-638, 2008-Ohio-800, ¶ 24 (applying plain error standard where "no party asked the trial court to remove the public defender as GAL on the basis of bias or for any other reason"); *In re West*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶ 25. *See also In re D.T.*, 5th Dist. No. 20 CA 000004, 2020-Ohio-3808, ¶ 62-66. "In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself." *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 18AP-109, 2019-Ohio-5318, ¶ 25.

*See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 40, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997) (stating that "[a]s when they apply criminal plain-error review, reviewing courts applying civil plain-error review 'must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice' "); *L.W.*, 2018-Ohio-2099, ¶ 36. " 'Because parental rights determinations are difficult to make and appellate courts accord wide latitude to the trial court's consideration of evidence in these cases, "[p]lain error is particularly difficult to establish." ' " *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 8, quoting *Faulks v. Flynn*, 4th Dist. No. 13CA3568, 2014-Ohio-1610, ¶ 20, quoting *Robinette v. Bryant*, 4th Dist. No. 12CA20, 2013-Ohio-2889, ¶ 28.

### C.  The Juvenile Court Committed Plain Error with Regard to the GAL

{¶ 55} J.S. argues the juvenile court erred both in admitting the GAL's report and testimony and also by failing to enforce R.C. 2151.281(D) and (I) by removing and replacing the GAL. The juvenile court's focus in determining whether to terminate parental rights is the best interest of the child. R.C. 2151.414(B)(1) and (D). The juvenile court is assisted in making this determination by considering information presented by the GAL, including the GAL's report, recommendation, and other testimony. *See* 2020 Sup.R. 48(D)(13) (stating that the duties established by the Rules of Superintendence are imposed "[i]n order to provide the court with relevant information and an informed recommendation as to the child's best interest"). The GAL here did little to assist the court in this regard.  P.H. argues in his second assignment of error that the juvenile court's determination that permanent custody was in A.S.'s best interest was not supported by clear and convincing evidence in the record, in part due to the GAL's lack of testimony or evidence related to his recommendation that permanent custody was in A.S.'s best interest.

### 1.  <u>The GAL failed in not faithfully discharging his duties</u>

{¶ 56} The Rules of Superintendence are intended to provide a nonexhaustive list of responsibilities and duties to guide GALs in faithfully discharging their duties as required by law, other rules, and pursuant to court order. Here, as noted above, the GAL was required to comply with the prior version of the Rules of Superintendence from the time of his appointment until January 1, 2021, when he was required to comply with the amended

rules. Likewise, he was required to comply with the applicable local juvenile rules. Therefore, we analyze the GAL's performance under all versions of the rules as applicable to the facts of this case.

### a. *Duty to become informed about the facts*

{¶ 57} The Rules of Superintendence make clear that it is incumbent upon the GAL to "[b]ecome informed about the facts of the case." 2021 Sup.R. 48.03(D)(1); 2020 Sup.R. 48(D)(13). *See also* 2020 Loc.Juv.R. 4(D)(1). The GAL in this case appears to have not been informed about many important facts of the case. For instance, in his final report, the GAL described P.H. as the "Alleged Father" and stated that "[t]here has been no genetic testing." (Feb. 4, 2021 Final GAL Report at 5.) However, FCCS's exhibits at the permanent custody hearing demonstrated that P.H. established paternity via genetic testing effective February 21, 2019, nearly two years before the permanent custody hearing and the GAL's final report. (FCCS Ex. 5.)

### b. *Duties to meet with, interview, and observe A.S.*

{¶ 58} Many of the Rules of Superintendence impose a requirement that the GAL meet with, interview, or observe the children. 2020 Sup.R. 48(D)(13)(a), (b), and (c) require the GAL: (1) meet with and interview the children, (2) observe the children with the parent, foster parent, guardian or physical custodian, (3) conduct one interview with the children where none of these individuals is present, (4) visit the children at his or her residence in accordance with any standards established by the court in which the GAL is appointed, and (5) ascertain the wishes of the children. *See also* 2021 Sup.R. 48.03(D)(2) through (6). The juvenile court imposed similar standards pursuant to 2020 Loc.Juv.R. 4(D) and 2021 Loc.Juv.R. 4.1(B)(2)(d) in part requiring the GAL to initiate and maintain reasonable contact with their client no less than once per month, with 2021 Loc.Juv.R. 4.1(B)(2)(d) further providing that such contact "shall be done outside of scheduled court hearings." 2020 Loc.Juv.R. 4(D)(1)(a) required the GAL to "[o]bserve the child [and] [b]e aware of the interaction between the parent and child, and the appropriateness of discipline, conversations, and activities." The GAL did not comply with many of these requirements.

{¶ 59} First, it appears from the record that the GAL only met with A.S. once over the nearly three years from the time of A.S.'s removal to the permanent custody hearing.

This is well short of the "once per month" standard set forth in the local juvenile rules and frankly well short of any standard considering the GAL had served for nearly three years prior to writing his final report and testifying at the permanent custody hearing. The GAL testified that "I would have preferred quite frankly to have done an in-person visit, with COVID I'm - - am just simply not doing them right now. That'll change the end of next or middle of next month * * * and I'll start doing those again, but like many of the guardians ad litem we're doing our visits by [videoconference]." (Feb. 11, 2021 Tr. at 248.) Regardless of concerns related to in-person visits due to the COVID-19 pandemic, the GAL did not visit A.S., either with his current foster family or in prior placements, in the approximately two years he served as A.S.'s GAL prior to the implementation of pandemic-related restrictions in 2020. In addition, the GAL only conducted one single interview via videoconference when the COVID-19 pandemic-related restrictions and concerns were in place. Also, there is no evidence the GAL ever interviewed A.S. where no foster parent, guardian, or physical custodian was present.

{¶ 60} Second, significantly, there is no evidence the GAL *ever* observed A.S. at a visitation with J.S., P.H., or both. Although the record reflects that J.S. sometimes was absent from visitations, the record is clear that P.H. consistently attended visitations. This is not a case where the parents have abandoned the child or repeatedly failed to visit the child. To the contrary, the evidence revealed and the juvenile court found that P.H. consistently visited A.S., played with A.S. at visitations, and deeply cared for A.S. The court specifically quoted P.H.'s testimony regarding his love for A.S. as follows: " 'I love him to death.' " (Apr. 22, 2021 Decision at 13.) The court found A.S. was excited to see P.H. and sometimes happy to see J.S. at visitations. The evidence is undisputed that P.H. maintained regular contact with A.S. through consistent attendance at visitations, which were uninterrupted with the exception of the period of time FCCS prevented contact during the COVID-19 pandemic. Layman testified that A.S. was "particularly" excited to see P.H. at visitations. (Feb. 11, 2021 Tr. at 174.) She further testified that A.S. responded well to P.H. because P.H. was joyful and happy with A.S. Layman testified that J.S. was less consistent with visits and less compliant with her case plan in all aspects compared to P.H. But Layman also testified that although J.S. was more reserved with A.S. because of her demeanor, there were many times A.S. was happy to see J.S. as well. Furthermore, Layman testified that as recently as eight days prior to the permanent custody hearing, when J.S.

and A.S. met via videoconference, A.S. called J.S. "mom" and was showing some signs of bonding with J.S. (Feb. 11, 2021 Tr. at 217.) Layman testified that, after working with FCCS staff, both J.S. and P.H. responded appropriately to A.S.'s behavior including by getting on the floor to prevent A.S. from being hurt by his own headbanging. There is no plausible explanation for the GAL's failure to observe A.S. at a visitation with P.H. and J.S., even considering the impact of the COVID-19 pandemic.

{¶ 61} Third, both J.S. and P.H. argue the GAL failed to ascertain A.S.'s wishes as he was required to do. The GAL testified he did not believe A.S. was able to express his own wishes. J.S. testified that she believed A.S. was able to express himself. Given A.S.'s young age and developmental issues, it may be that A.S. was not able to express himself. However, the GAL made this determination after only a single meeting between the GAL, A.S., and A.S.'s current foster family via videoconference. In support of this opinion that A.S. was not able to express his wishes, the GAL stated that A.S. was on the foster parent's lap during the virtual meeting and "had to be redirected a lot." (Feb. 11, 2021 Tr. at 247.) In his final written report to the juvenile court filed February 4, 2021, the GAL stated that A.S. "appeared to be bonded with [one foster parent] and other children in the home." (Feb. 4, 2021 Final GAL Report at 3.) With regard to A.S.'s bond with his current foster family, the GAL testified at the permanent custody hearing as follows:

> [F]rom what I could see, he did seem to be bonded with -- I didn't see him with the entire -- all the people that live in [the foster parents'] household, but from what I could see, he did seem to be bonded with the people that I saw him interact with including [one of the foster parents].
>
> * * *
>
> But I had not heard anything at all that had to do with any concern of nothing well cared for simulated [sic] being, you know, bonded with the family, haven't heard anything.

(Feb. 11, 2021 Tr. at 248.) However, the record does not reflect the GAL attempted to speak with A.S. without the foster parents present or in another setting about A.S.'s wishes, concerns, or bonds with P.H., J.S., or the foster family members.

### c. *Duties to contact all parties, foster parents, and other significant individuals*

{¶ 62} The Rules of Superintendence in effect until January 1, 2021 also imposed a requirement that the GAL "contact all parties," including "[m]eet[ing] with and interview[ing] the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case [in addition to] school personnel, medical and mental health providers." 2020 Sup.R. 48(D)(13)(d) and (g). Under the Rules of Superintendence effective January 1, 2021, in addition to the above requirements, the GAL was informed that the GAL "may require" the parties, foster parents, and other significant individuals "to be interviewed without the presence of others." 2021 Sup.R. 48.03(D)(6). The juvenile court imposed similar standards requiring the GAL "to contact all relevant persons" in conjunction with 2020 Loc.Juv.R. 4(D)(1)(c), (d), and (e) duties. 2020 Loc.Juv.R. 4(D)(1). 2020 Loc.Juv.R. 4(D)(1) further required the GAL to "[d]etermine the physical and mental health of the child," "[a]sk the care providers for their perceptions of the child's adjustment," and "[a]ssess the child's developmental level." 2020 Loc.Juv.R. 4(D)(1)(d) and (k). Our review of the record reveals the GAL failed to fulfill many of the aforementioned duties of contacting the specifically identified persons in addition to any other relevant persons.

{¶ 63} First, there is no evidence in the record to support finding the GAL observed A.S.'s interaction with both foster parents. The GAL testified he observed A.S. one time via videoconference with his foster mother and some of the children in the home. It is clear from the GAL's own testimony that he did not interview or observe the foster father and every other member of the foster family. Nor did the GAL observe A.S. when he was placed with C.S., his half-sister. As noted above, the GAL also never observed visitations between P.H. and A.S. or visited P.H.'s residences aside from a virtual tour of P.H.'s new residence immediately before the permanent custody hearing. Regardless of this limited contact, the GAL opined that A.S. "is bonded with his foster family which includes the foster parents and other children in the home." (Feb. 4, 2021 Final GAL Report at 7.) Furthermore, when

the juvenile court inquired if he was recommending permanent custody to FCCS for purposes of adoption, the GAL replied yes.[14]

**{¶ 64}** Second, while the rules required the GAL to contact the parties, there was some evidence the GAL believed it was the responsibility of the parties to contact him. In response to questioning about his contact with J.S., the GAL stated: "Well, here's the thing. They can call me too[.] * * * You know, one of the things that I've always done, one of the values I have as a guardian is that I value when the – when the parents are proactive and contact me." (Feb. 11, 2021 Tr. at 258-59.) Although the record did reflect some difficulty with maintaining contact with J.S. due to her having multiple different phone numbers over the course of the case, the record is also clear that the GAL never observed J.S. at visitations or had more than two to three face-to-face conversations with J.S. outside of court appearances over the course of the proceedings.

**{¶ 65}** Third, the GAL's testimony and his report do not reflect that the GAL spoke to all relevant parties as required by the Rules of Superintendence and local juvenile rules. The record reflects A.S. attended preschool at the time of the permanent custody hearing and had been seen by healthcare providers with regard to his developmental and special needs. However, the record does not reflect the GAL spoke with any of A.S.'s school personnel or healthcare providers. The GAL's reports do not include any medical, occupational therapy, or school records in the list of records he stated he reviewed, and contains no information or assessment regarding the same. This information was important to know for a best interest recommendation and determination—in order to consider whether J.S. and/or P.H. could meet A.S.'s needs and whether FCCS and the current foster family were able to meet A.S.'s needs, the GAL and the court would necessarily need to know what A.S.'s needs are and, in particular, his special needs and how those needs can be met. The GAL provided no information in this regard based on his own investigation.

#### d. *Duty to request evaluation/assessment of the parties*

**{¶ 66}** The Rules of Superintendence 2021 Sup.R. 48.03(D)(9) and 2020 Sup.R. 48(D)(13)(h) require a GAL to recommend/request that the court order "psychological

---

[14] Layman testified that A.S. was placed in a foster-to-adopt home and that if A.S. were to become available for adoption, they would be interested in pursuing adoption of A.S. She further testified there were ten individuals in the home, two adults and eight children, including A.S.

evaluations, mental health and/or substance abuse assessment, or *other evaluations* or tests of the parties as the guardian ad litem deems necessary or helpful to the court." (Emphasis added.) The local juvenile rules impose a similar requirement. 2020 Loc.Juv.R. 4(D)(g). Yet, the GAL never recommended to the court that an evaluation be conducted to determine if P.H. had cognitive impairments or developmental delays—and, if so, the extent to which such impairment or delay would impede caring for and meeting the needs of A.S., if at all. The GAL first generally noted some cognitive delays in P.H. in his third GAL report; then again in his fourth GAL report. Finally, in his final GAL report he noted more details as relayed to him by P.H.'s mother.

{¶ 67} In support of his second assignment of error, P.H. argues the record does not support the juvenile court's finding that P.H. himself had cognitive delays and as a result struggled to meet his own needs as well as the needs of A.S. P.H. argues there was no admitted competent testimony regarding whether he had cognitive delays at all and/or that he struggled with his own needs. P.H. correctly asserted that when Layman attempted to testify regarding the reason P.H. receives SSDI, an objection was made and sustained on grounds that such testimony would require a medical opinion and it was based on hearsay from what P.H.'s mother told Layman. The juvenile court did permit Layman to testify regarding what P.H. himself told her, that "he doesn't think like other people think and that he doesn't read well." (Feb. 11, 2021 Tr. at 170.)

{¶ 68} The GAL testified he believed P.H. "has tried his best as he is able to with the developmental issues that he has." (Feb. 11, 2021 Tr. at 255.) The GAL also testified that P.H.'s mother had made him aware of P.H.'s cognitive impediments and the reason P.H. receives SSDI.[15] The GAL then testified that "I have a friend whose daughter has the same condition as [P.H.] has and a lot of [P.H.'s] actions are similar to this young lady although [P.H.] is far – higher functioning than my friend's daughter." (Feb. 11, 2021 Tr. at 273.) The GAL ultimately opined that he believed "some of the – the cognitive delays that [P.H.]

---

[15] Recognizing it was hearsay, the GAL did not elaborate on what P.H.'s mother told him regarding P.H.'s cognitive impediments and the reason he receives SSDI.

has without – without consistent support[16] is gonna be difficult and * * * not in [A.S.'s] best interest."  (Feb. 11, 2021 Tr. at 272.)

{¶ 69}  The testimony of both Layman and the GAL was nonspecific and consequently only invited speculation as to whether P.H. had cognitive delays and as to whether P.H. could or could not meet his own or A.S.'s needs as a result of such cognitive delays.  The amended case plan for P.H. did not include any assessment or evaluation regarding the existence or extent of cognitive or developmental delays or regarding whether such delays impaired P.H.'s abilities to care for himself and, more importantly, care for A.S.  The GAL indicated that he reviewed the amended case plan.  Thus, he was aware that no such evaluation was required by FCCS, but he did not request that the court perform such an evaluation, despite being aware generally of some cognitive issues at least as early as August 2, 2019 when he filed his third GAL report.  Notwithstanding, the GAL based his best interest recommendation, in part, on his concerns that P.H. had cognitive delays that impaired him being able to meet A.S.'s needs.

### e.  *Duty to conduct independent assessments*

{¶ 70}  The GAL opined both in his final written report and in testimony at trial that it is in A.S.'s best interest to place him into the permanent custody of FCCS.  However, as summarized above, the GAL failed to perform his required duties in significant ways.  Importantly, his report and testimony do not appear to have been supported by sustained, independent observations and contact with A.S. and relevant parties over the nearly three years from the time of his appointment to the writing of his final report.  Instead, his report and testimony appear to be based on the mere handful of times he interacted with some of the relevant parties in addition to ongoing contact with FCCS caseworkers and supervisors.  Moreover, it appears the GAL was basing his opinion at the permanent custody hearing in part on testimony he heard at the hearing itself.  In answering whether A.S. should be placed with J.S., the GAL answered "I haven't heard any testimony from [J.S.] about her ability to address [A.S.'s] special needs."  (Feb. 11, 2021 Tr. at 270.)  "A GAL is under a duty

---

[16] In his final GAL report, the GAL stated he spoke with P.H.'s mother and she stated that prior to A.S. being removed, P.H. "attended to [A.S.'s] needs by purchasing diapers, formula, other baby supplies, 'everything' that the child needed. [P.H.] also paid the bills and took care of the utilities." (Feb. 4, 2021 Final GAL Report at 4.) P.H.'s mother would help by taking P.H. to the store to buy groceries, toys, and supplies for A.S. P.H.'s mother stated P.H. "can parent on his own without help," but that she would support him and A.S. by being present "on a regular basis, possibly every day." (Feb. 4, 2021 Final GAL Report at 5.)

to 'provide the juvenile court with an independent evaluation of the issues.' " *D.E.*, 2021-Ohio-524, at ¶ 90, quoting *In re Ridenour*, 11th Dist. No. 2003-L-146, 2004-Ohio-1958, ¶ 25. In order to accomplish this duty, a "guardian's recommendation, then, should not be based on the testimony given at the hearing, but on the guardian's own experience in the case." *Ridenour* at ¶ 25. *See In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, ¶ 13 (stating that the purpose of the statutory provisions providing for the appointment of a GAL "is to give the court information, in addition to that elicited at the hearing, to assist it in making sound decisions concerning permanent custody placements").

### f. *Requirement to apply "best interest" factors as outlined in R.C. 2151.414(D)*

{¶ 71} R.C. 2151.281(I) requires the GAL to perform whatever functions are necessary to protect the best interest of the child. In determining whether granting permanent custody to FCCS is in the best interest of the child, the court must consider one of two alternatives and the best interest factors outlined in either R.C. 2151.414(D)(1) or (2).[17] The GAL, however, outlined in his final report the best interest factors in R.C. 3109.04

---

[17] Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) one of the factors set forth in R.C. 2151.414(B)(1) applies, and (2) it is in the best interest of the child."

In determining whether granting permanent custody to a public children services agency is in the child's best interest, the court must consider one of two alternatives. Under R.C. 2151.414(D)(1), the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

In the alternative, if a court finds that all four of the factors under R.C. 2151.414(D)(2) apply, then "permanent custody is in the best interest of the child, and the court *shall* commit the child" to the custody of a public children services agency and grant the motion for permanent custody. (Emphasis added.) R.C. 2151.414(D)(2). The four enumerated factors required for making a finding under R.C. 2151.414(D)(2) are:

(a) The court determines by clear and convincing evidence that one or more of the factors in [R.C. 2151.414(E)] exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to [R.C. 2151.415(D)].

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to [R.C. 2151.353(A)(5)].

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

Thus, in order to make a finding under R.C. 2151.414(D)(2)(a), the juvenile court must also make a finding that one or more of the factors under R.C. 2151.414(E) apply. The juvenile court found the following factors under R.C. 2151.414(E) applied in this matter:

(F)(1)(a) through (e)—which apply in the context of determining custody in the case of "divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child." R.C. 3109.04(A). In this case, the GAL was making a recommendation of best interest to the court regarding a motion for termination of parental rights, not allocation of parental rights.

### 2. The juvenile court plainly erred in not requiring the GAL to perform his duties and in not discharging the GAL

{¶ 72} In addition to the obligations imposed on the GAL under the plain terms of R.C. 2151.281(I), the Rules of Superintendence, the juvenile rules, and the local rules of the juvenile court, the juvenile court itself was obligated by R.C. 2151.281(D) to "require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem." Furthermore, the juvenile court was obligated by the Rules of Superintendence to "review all guardian ad litem reports, written or oral, to ensure that the guardian ad litem has performed those responsibilities required by R.C. 2151.281." 2021 Juv.R. 48.06(B)(2). The court itself noted the GAL's obligation to comply with the rules and law applicable to GALs in its November 5, 2020 pre-trial orders on the motion for permanent custody, stating that "GAL **SHALL** comply with *Swisher*, 2003-Ohio-5446, ¶ 47 and 48, Sup.R. 48(D), Local R. 27, & R.C. 2151.281. Report **SHALL** be filed on or before seven (7) days prior to trial." (Emphasis sic.) (Nov. 5, 2020 Pre-Trial Orders at 2.) Both the juvenile court and the magistrate separately

---

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

reminded the GAL to update and file reports.  It is incumbent upon the juvenile court to comply with these statutory provisions and court-promulgated rules in order to ensure the permanent custody proceedings are fair and just, and that the best interests and welfare of any minor children subject to such proceedings are adequately and properly represented.

{¶ 73} Presumably, pursuant to its duty, the juvenile court was reviewing the GAL's reports.  The GAL filed five reports.  Not one of them indicated the GAL had observed A.S. with J.S. or P.H.  Not one of them indicted the GAL contacted school or medical personnel. There was no indication in the first four reports that the GAL had ever visited A.S.  And, although the GAL indicated in the third, fourth, and final reports that he was aware of general cognitive issues with P.H., there was never a request for evaluation regarding the same.  Other than the general admonition to the GAL to comply with its duties and to file and update reports, the juvenile court did not enforce the specific duties outlined above.

{¶ 74} FCCS argues that we have previously stated that "it would be a rare circumstance for the court to find that the GAL's failure to comply with the Rules of Superintendence or local rules alone would result in reversal."  *D.E.*, 2021-Ohio-524, at ¶ 92.  FCCS further argues that neither J.S., P.H., nor their counsel objected to the admission of the GAL's testimony or otherwise argued that the juvenile court was required to replace the GAL under R.C. 2151.281(D).  Indeed, we acknowledge both arguments are true.

{¶ 75} Notwithstanding, under the facts and circumstances present in this case, as outlined above, we find the juvenile court committed plain error under R.C. 2151.281(D) in not requiring the GAL to faithfully discharge his duties and in not discharging the GAL and appointing a new GAL for failure to faithfully discharge GAL duties, as well as in admitting the GAL's report and testimony.  In finding plain error, we consider all the facts specific to this case,[18] in particular the fact that over the course of three years, the GAL never observed

---

[18] Recently, in *D.E.*, 2021-Ohio-524, this court found that despite significant deficiencies in the GAL's investigation, the juvenile court did not plainly err in admitting the GAL's testimony. The facts in *D.E.* can be distinguished from the facts in the case before us in several ways, including the fact that the juvenile court recognized and commented upon the GAL's deficiencies. *Id.* at ¶ 78-79. Also, the appellant in *D.E.* was "very inconsistent" and "very sporadic" with visitation with the children and had not visited the children for a seven-month period. *Id.* at ¶ 22. In addition, the GAL in *D.E.* did visit each of the children at least once. Furthermore, the appellant in *D.E.* had not made progress in complying with her case plan as J.S. and in particular P.H. did in the case before us. Furthermore, in *D.E.,* the appellant did not assert as error, plain or otherwise, that the juvenile court erred pursuant to R.C. 2151.281(D) and (I).

A.S. with J.S. or P.H. and only visited A.S. once via videoconference. In a permanent custody proceeding, the best interest of the child is paramount. Furthermore, as we have noted, when considering permanent termination of parental rights, parents "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). With this in mind, we find this is the extremely rare case involving exceptional circumstances such that the juvenile court's error, if left uncorrected, would challenge the fairness, integrity, and public reputation of the permanent custody parental termination judicial process.

{¶ 76} Accordingly, we sustain J.S.'s first and second assignments of error.

## V. J.S. and P.H.'s Remaining Assignments of Error

{¶ 77} Our resolution of J.S.'s first and second assignments of error is dispositive of this appeal and forms the basis for our decision to reverse and remand this case as to J.S. and P.H.[19] We need not, therefore, express an opinion concerning J.S.'s remaining assignments of error and as to P.H.'s three assignments of error. Accordingly, we render moot J.S.'s third and fourth assignments of error and P.H.'s three assignments of error.

## VI. Conclusion

{¶ 78} We sustain J.S.'s first and second assignments of error. We render moot J.S.'s third and fourth and P.H.'s three assignments of error. Therefore, we reverse the April 22, 2021 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch. On remand, the juvenile court shall (1) vacate its April 22, 2021 judgment; (2) retain jurisdiction over A.S.; (3) discharge the GAL in this case and appoint a new GAL with instructions for the new GAL to faithfully discharge the duties of the GAL in compliance with the applicable statutes and rules addressed herein and to address in particular deficiencies in the GAL's evaluation, report and recommendation as identified herein; (4) instruct FCCS to report and provide new evidence to the juvenile court

---

[19] We acknowledge that P.H. did not assert as error the juvenile court's plain error in failing to enforce R.C. 2151.281(D) and (I) as J.S. did. The duty of a child's GAL is to provide the court with information and recommendations regarding the child's best interest. In determining its recommendation regarding A.S.'s best interest, the GAL's must consider what is revealed in its independent evaluation and assessment of both J.S. and P.H., and the juvenile court must consider the same. Furthermore, as noted above, P.H. raised many arguments regarding the GAL's deficiencies in support of his first and second assignments of error. Therefore, we do not consider it appropriate at this time to dispose of P.H.'s assignments of error as the new GAL shall conduct a new independent evaluation and assessment as it relates to both J.S. and P.H. when determining its best interest recommendation to the juvenile court. Likewise, the juvenile court shall consider supplemental and new evidence regarding J.S. as well as P.H. at the new hearing.

on progress, or lack thereof, regarding compliance with the amended case plans, since the February 11, 2021 hearing; (5) conduct a new hearing and consider evidence already presented as well as supplemental and new evidence admitted after remand; and (6) enter an order of disposition as determined appropriate by the juvenile court pursuant to R.C. 2151.353 and 2151.414(A)(2) ("[t]he court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody"). Finally, sensitive to the concern that children and parents not be left in legal limbo for months and even years while waiting for courts to process their cases, we instruct the juvenile court to act promptly on remand and to proceed consistent with this decision.

*Judgment reversed*
*and cause remanded with instructions.*

MENTEL, J., concurs.
LUPER SCHUSTER, P.J., dissents.

LUPER SCHUSTER, P.J., dissenting.

{¶ 79} Because I would affirm the judgment of the juvenile court granting FCCS's motion for permanent custody of A.S., I respectfully dissent.

{¶ 80} The majority finds the trial court committed plain error both in failing to discharge and replace the GAL and in admitting the testimony and report of the GAL. I agree with the majority that the GAL's investigation of the matter was deficient, but I nonetheless would not find this case to be the "rare circumstance" in which the GAL's deficiencies alone should result in reversal. *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 92. Here, FCCS presented ample evidence that granting the motion for permanent custody was in the best interest of A.S., including competent, credible evidence that neither parent could adequately meet A.S.'s basic and special needs. I would not find that any concerns with the thoroughness of the GAL's investigation detracted from the other evidence at trial. *See In re D.E.* at ¶ 92 (noting a juvenile court is not bound by a GAL's recommendation). Thus, I would find the GAL's conduct and the trial court's admission of the GAL's testimony and report did not affect the outcome of the trial. *In re D.K.*, 10th Dist. No. 19AP-801, 2020-Ohio-5251, ¶ 40 (considering plain error in a civil case, including a permanent custody case, " '[a]n error is prejudicial if it "impacted the party's 'substantial

rights' by affecting the outcome of the trial" ' "), quoting *In re J.L.*, 10th Dist. No. 15AP-889, 2016-Ohio-2858, ¶ 60, quoting *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 27.

{¶ 81} In addition to finding that the granting of the permanent custody motion was in the best interest of A.S. and that the trial court did not plainly err with respect to the GAL, I would further find that J.S.'s arguments about her trial counsel do not substantiate a claim of ineffective assistance of counsel, that the record supports the trial court's finding that A.S. could not be placed with P.H. within a reasonable time, and that the Supreme Court of Ohio's pandemic tolling order did not apply to the permanent custody hearing. Accordingly, I would overrule all four of J.S.'s assignments of error and all three of P.H.'s assignments of error, and I would affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

{¶ 82} For these reasons, I respectfully dissent.

————————————