**[Cite as *In re C.A.P.*, 2026-Ohio-661.]**

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| IN THE MATTER OF: | **CASE NO. 2025-P-0073** |
| C.A.P., DEPENDENT CHILD | Civil Appeal from the Court of Common Pleas, Juvenile Division |
| | Trial Court No. 2022 JCC 00599 |

---

## OPINION AND JUDGMENT ENTRY

Decided: February 26, 2026
Judgment: Affirmed

---

*Barbara J. Rogachefsky*, Barbara J. Rogachefsky Co., L.P.A., 1653 Merriman Road, Suite 104, Akron, OH 44313 (For Appellant, Michael Petit).

*Connie J. Lewandowski,* Portage County Prosecutor, *Holly M. Spohn*, and *Brandon J. Wheeler*, Assistant Prosecutors, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee, Portage County Department of Job and Family Services).

*Karlek D.D. Jarvis*, 206 South Meridian Street, Suite A, Ravenna, OH 44266 (Guardian ad litem for Appellant).

*Rebecca R. Grabski*, Bret Jordan Co., L.P.A., 206 South Meridian Street, Suite A, Ravenna, OH 44266 (Guardian ad litem for minor, C.A.P.).

*Thomas Grist*, 114 Barrington Town Square Drive, 342, Aurora, OH 44202 (Guardian ad litem for Mother, Debra Wymer).

ROBERT J. PATTON, J.

{¶1} Appellant, Michael Petit ("Father"), appeals the decision of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of minor

child "C.P." to Portage County Jobs and Family Services ("PCJFS"). For the following reasons, we affirm.

{¶2} Father presents two assignments of error for review. Father asserts that the trial court's decision to grant permanent custody to PCJFS was an abuse of discretion and not supported by clear and convincing evidence. Upon review of the record in this case, we conclude that the trial court's best-interest analysis and judgment is consistent with the manifest weight of the evidence.

{¶3} Father also contends that the trial court committed reversible error when it failed to enforce R.C. 2151.281. Specifically, Father asserts that the Guardian ad Litem's ("GAL") report was deficient and that the trial court was precluded from granting permanent custody to PCJFS. Without question, the GAL report was subpar at best. However, Father had opportunity to cross-examine Rebecca Grabski ("Grabski") and did so during the hearings on the motions for custody. The trial court could assign weight to the GAL's report in consideration of the motions for custody of C.P. The trial court made clear that its decision was not premised on the GAL's report. Indeed, upon review of the record, it is clear that there was ample evidence presented to the trial court to determine that it was in the best interest of C.P. to be placed in the permanent custody of PCJFS, notwithstanding the GAL's report. Thus, reversal is not required. *In re A.A.*, 2024-Ohio-224, ¶ 56 (10th Dist.).

{¶4} Accordingly, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

**Substantive and Procedural Facts**

{¶5}   D.W. ("Mother") and Father are the biological parents of minor child, C.P. On November 8, 2022, PCJFS filed a verified complaint for temporary custody of C.P. after receiving reports that the child was being locked in her room, had not been to a medical doctor, was not enrolled in school, and had very little interaction with her parents. Grabski was appointed as the GAL for C.P. on November 9, 2022.

{¶6}   A civil pretrial was held on November 23, 2022. After the hearing, C.P. remained in legal custody of the parents with an order of protective supervision. An adjudicatory hearing was held on December 22, 2022. Both parties were present at the hearing. C.P. was adjudicated dependent pursuant to R.C. 2151.04. A dispositional hearing was held on January 19, 2023. At the hearing, the court adopted the case plan previously filed with the court, and legal custody continued with Mother and Father with an order of protective supervision. On January 12, 2023, the GAL filed a report with the court below.

{¶7}   On August 14, 2023, PCJFS filed a motion to modify disposition. A hearing was held on the motion on September 7, 2023, and the motion was granted. The same day, C.P. was removed from Mother's and Father's home and placed in temporary custody of PCJFS.

{¶8}   On October 20, 2023, PCJFS filed a motion to extend temporary custody. An annual review hearing and hearing on the motion for extension of temporary custody was held on October 26, 2023. The motion to extend temporary custody was granted.

{¶9}   On December 11, 2023, Mother filed a motion for legal custody of C.P. On January 4, 2024, Father filed a motion for legal custody of C.P. A status review and

Case No. 2025-P-0073

hearings on both motions for legal custody were held on January 18, 2024. Both Mother and Father's motions for legal custody were denied and C.P. continued in temporary custody of PCJFS.

{¶10} On March 7, 2024, PCFJS filed its second motion to extend temporary custody of C.P. On April 9, 2024, a hearing on PCJFS's second motion to extend temporary custody was held and PCJFS's motion was granted. A status review hearing was held on July 2, 2024. At the hearing, attorneys for both Mother and Father filed motions for the appointment of a GAL for both of their clients. Mother and Father's motions for the appointment of a GAL were granted the same day. On July 3, 2024, Attorney Karlek Jarvis was appointed GAL for Father, and attorney Thomas Grist was appointed GAL for Mother.

{¶11} On October 4, 2024, PCJFS filed a motion for permanent custody of C.P. On October 28, 2024, Mother filed a motion for legal custody. On November 8, 2024, Father filed a motion for legal custody. On January 23, 2025, Grabski filed a GAL report. Hearings were held on PCJFS's motion for permanent custody, and both Mother's and Father's motions for legal custody on January 29, 2025 and April 29, 2025. The following facts were presented at the hearings:

{¶12} At the January 29, 2025 hearing, Janie Rodkey ("Rodkey"), former employee of PCJFS and a case worker assigned to C.P.'s family from November 2022 to September 2024, testified. Rodkey explained that the PCJFS became involved after reports were received alleging that C.P. was being locked in her room, that she was not enrolled in school, that she had not seen a doctor, and that she was getting very little interaction at home. Rodkey testified that she drafted a case plan after C.P. was

adjudicated dependent at the December 22, 2022 hearing. The case plan was filed with the trial court on December 22, 2022. In addition to the case plan, a safety plan was created with the family on July 7, 2023. Rodkey explained that the safety plan was a "voluntary agreement between the parents and the agency to minimize safety concerns."

{¶13} Rodkey indicated that Mother and Father "engaged in case plan services shortly after the adjudication hearing." Rodkey testified that she visited the family home with her supervisor after learning that C.P. had broken her arm which required emergency surgery to place a pin in C.P.'s elbow.[1] Rodkey stated, "we found the home to be deplorable. There were nails and equipment, tools found spread throughout the house because they were doing a – they were fixing their steps going up to their trailer. We found [C.P.] to be locked back in her room." Rodkey testified that a main concern of the agency were Mother and Father's use of baby gates, "we found two baby gates stacked on top of each other. [C.P.] was laying on subflooring. There was food spread out throughout her room. Her hair was matted." Rodkey stated that C.P. could not get into the bathroom, and that there was lumber laying everywhere around the house. Rodkey testified that Mother and Father were "using zip ties to keep [C.P.'s] clothes together and duct tape on her diapers." After the visit, Rodkey told Mother and Father that "that [C.P.] could not stay at this house at this time and that she needed to leave." C.P. was then placed in the care of her maternal grandparents. Mother and Father were permitted to have supervised visits with C.P.

{¶14} After being placed in the care of the maternal grandparents, Rodkey testified that "[C.P.] still had not been enrolled in a school, and [C.P.] had some needs

_____

1. Rodkey testified that she received multiple stories from the parents as to how C.P. broke her arm.

Case No. 2025-P-0073

that needed to be taken care of. [C.P.] was nonverbal at the time, and she was very behind for her age." Rodkey said that C.P. was five at the time. According to Rodkey, C.P. was later removed from the maternal grandparents' home and placed into foster care in November 2023 when it was discovered that they had permitted Mother and Father unsupervised time with C.P.

{¶15}   Rodkey testified to the trial court that Mother's case-plan objectives were to "get a mental health assessment, to get a parenting assessment and to maintain basic needs" and maintain a clean house. Rodkey stated Mother was either engaged in the case-plan services or had completed her case-plan objectives when Rodkey's employment with PCJFS ended. After Mother had completed parenting classes as part of her case-plan objectives, Rodkey observed C.P. in the home with Mother. According to Rodkey, after the child did not know her name, Mother would "physically handle" C.P. when attempting to redirect her, by "pulling her."

{¶16}   Rodkey stated that Father's case-plan objectives were the same, though he had not completed his objectives by the time she left PCJFS. Rodkey testified that Father "never parented her, whether it was in a home visit while she was in the home or our visits while I was visiting them after she was removed. He didn't pay much attention to her . . . ."

{¶17}   During her employment at PCJFS, Rodkey stated that neither Mother nor Father were able to achieve their goals of addressing concerns identified to safely parent C.P. Rodkey testified that Mother and Father "completed their parenting classes at Ever Well, and it was clear that it did not translate. The parenting classes were not intensive enough to allow them to effectively parent . . . ." Rodkey explained that Ever Well is a ten-

Case No. 2025-P-0073

week parenting class that takes place at the parent's home. Rodkey stated that after Mother and Father completed the Ever Well parenting classes, they were still unable to provide appropriate food for C.P., and that the parents "had a confusion about her being lactose intolerant. We kept having to correct them what that meant . . . they didn't understand that [C.P.] couldn't drink milk."

{¶18} Rodkey testified that both parents also completed Lighthouse assessments resulting in a recommendation that C.P. should not reunify with her parents. The parents were referred to a more intensive parenting program through Goodwill Parenting in "May or June of '24."

{¶19} According to Rodkey, she observed 15 to 20 visits with C.P. and her parents. "[Mother] did most of the parenting . . . . She did try very hard, and she could do the things if we directed her do so. If we told her that [C.P.] needed to eat and she needed to eat at this certain time, she would do that, but it was after having direction to do that. [Father] would interact with [C.P.], but he would become very - - like if [C.P.] lost interest he would also lose interest, and he would be seen either playing by himself or he would be interacting with us more than [C.P.]. They had a very hard time trying to build more interaction with [C.P.] than other like baseline just like reading a book and whatnot."

{¶20} Rodkey testified that based on her observations of the visits, the parents and C.P. did not seem to have significant bonds with one another. Rodkey stated that C.P. would get overwhelmed during visits and ask to leave, and that she seemed more bonded with her foster mom. Rodkey testified that C.P. was very sick when initially placed in a foster home and spent "probably a month" in the hospital. She explained that C.P. had been drinking milk from a sippy cup, despite her lactose intolerance, combined with

Case No. 2025-P-0073

baby cereal. The combination damaged C.P.'s teeth. "[S]he went into the hospital twice, and she had to have emergency surgery. She was diagnosed with corona virus, rhino virus, Covid and then she had pneumonia, and they had to physically go there and like relieve her lungs because her body could not fight it off. She then had to go see like a specialist after that."

{¶21} Rodkey stated that after being placed in foster care C.P. was brought up to date on medical vaccinations. Additionally, C.P.'s foster mother spent time with C.P. teaching her to learn her name, learn words, and simple motor skills. Rodkey testified that she believed C.P. to have a significant bond with her foster parents.

{¶22} Rodkey testified that to her knowledge, Mother was diagnosed with bipolar disorder and Father has had a traumatic brain injury and a partial lobotomy. Rodkey testified that while the parents were allowed more visitation after C.P. was removed from the home, they only came to visit her once a week.

{¶23} Dr. Aimee Thomas ("Dr. Thomas"), a licensed psychologist and professional clinical counselor, also testified at the January 29, 2025, hearing. Dr. Thomas explained that she works for Lighthouse Family Center where Mother and Father participated in services. Dr. Thomas testified that she created the company in 2018, providing "various services, individual counseling, family counseling[,] as well as evaluations including parenting evaluations." Dr. Thomas explained that she conducts evaluations for Jobs and Family Services, domestic relations court, and juvenile court.

{¶24} Dr. Thomas testified that she has conducted over three thousand parenting evaluations. Dr. Thomas explained that a parenting evaluation is "a psychological evaluation with a lens towards parenting so that includes looking at any factor of a

Case No. 2025-P-0073

person's life that impacts their ability to raise their children competently." Those factors could include "anything from housing, employment, mental health, substance abuse, support systems, romantic partners, looking at how they were raised." The goal of the parenting evaluations "is to create a case plan with the goal of reunification for people involved with child protective services."

{¶25} Dr. Thomas explained the evaluations are conducted in person, and recommendations are formulated "based on all the data [the participants] provided, the psychological testing as well as integrating collateral data from children's services or other agencies." Dr. Thomas testified that she conducted parenting evaluations of both Mother and Father.

{¶26} Dr. Thomas testified that she met with Father on April 4, 2024, and April 11, 2024. Dr. Thomas indicated that she evaluated Father and generated a report based on the evaluation (Exhibit E). Dr. Thomas stated that she received information from children's services regarding Father but was unable to receive data regarding Ever Well or Lighthouse assessments for Father. Dr. Thomas testified that she assessed Father using the "Kaufman Brief Intelligence Test, the Kaufman Functional Academic Skills Test, the Millon Clinical Multiaxial Inventory, search for clinical interview for DSM-V disorders, parenting stress index, and the substance abuse screening inventory."

{¶27} Dr. Thomas stated that Father's Kaufman Brief Intelligence Test indicated that "his verbal IQ is 72, his nonverbal IQ is 77, and his full scale IQ is 71 . . . [and] indicates that he presents with some cognitive limitations." Dr. Thomas testified that the "clinical interview [indicated] he had difficulties with time and was a poor historian, and he had a significant brain injury and had a partial lobotomy as a result of it when he was in

6th or 7th grade so this test might not have been sensitive enough to fully identify concerns with his cognitive deficits . . . . But nevertheless it's [indicative] that he was functioning at the level of an 11-year old with regard to verbal skills and an 8-year old in terms of nonverbal skills." Dr. Thomas stated this would impact his ability to safely parent by impacting his ability to learn and internalize parenting instructions, or whether he can even retain skill training received on parenting or counseling. Dr. Thomas indicated the scores "reflect concerns with judgment, reasoning, cause and effect thinking or even disability perceived potential problematic or dangerous situations."

{¶28} Dr. Thomas testified that on the Kaufman Functional Academic Skills Test, Father "scored a 68 on the arithmetic subtest, a 99 on the reading subtest and his composite score is 83 so this is in the below average range of ability so some things he can read and his comprehension level was fairly good with short sentences, not more complex passages." Dr. Thomas explained this might impact his parenting ability when faced with administering prescribed medicine and reading instructions.

{¶29} Dr. Thomas stated that she could not assess Father's Millon Clinical Multiaxial Inventory because he chose not to answer a significant number of questions of the test.

{¶30} Dr. Thomas stated that as a result of Father's structured clinical interview, Father "appeared to either lack insight or not really understand any underlying emotional difficulties that he may present with. It was noteworthy that he insisted that he was fine, he didn't really have any problems until [C.P.] was removed from his custody. He was obviously experiencing significant emotional distress since his daughter was removed from the home. That manifested in depression and missing his child."

Case No. 2025-P-0073

{¶31} Dr. Thomas indicated that she was unable to get valid results on Father's substance abuse subtle screening inventory because Father was "defensive in his approach to that inventory."

{¶32} When asked whether it was her opinion that there were interventions available to ensure Father could parent [C.P.] appropriately, Dr. Thomas stated, "I don't use this language lightly. It is very rare that I am making such strong opinions, but this was based on the fact that they received interventions in the home, added support, and yet still were unable to recognize that their approach to parenting was problematic, and that is in part due to their own cognitive limitations, [Father]'s traumatic brain injury that can impact his ability to process information so based on the factors that are quite frankly in respect outside of [Mother] and [Father]'s control as it relates to a traumatic brain injury and their intellectual functioning, but based on these factors it was going to make it in my opinion nearly impossible for them to independently raise a child with such profound needs paired with their lack of insight so again I offer the opinion that he had met the maximum therapeutic benefits of his treatment services." Dr. Thomas further testified that her opinion is unique with regard to Mother and Father and their ability to meet the special needs of C.P. Dr. Thomas also indicated that her opinion might "possibly" be different with an individual that doesn't have C.P.'s needs.

{¶33} Amy Humrighouse ("Humrighouse"), a parenting instructor at Goodwill Industries of Canton, also testified at the January 29, 2025 hearing. Humrighouse explained that Goodwill Industries offers parenting skills training programs. According to Humrighouse, when a participant is referred to the training program, Goodwill Industries reviews collateral information including "information from the complaint" and "a parenting

assessment through a psychological" assessment and "the case plan." After referral, "each individual does an intake private with my supervisor that talks about their case and why they're referred." Once this information is gathered, Goodwill Industries develops "program goals for each individual."

{¶34} Humrighouse further explained that each program plan addresses topics in class which are also designed to improve the areas of concern that were identified when the participant was referred to the program.

{¶35} Humrighouse testified that there are four certificate levels offered and explained that while an individual may complete the course, the individual may still be unsuccessful. According to Humrighouse, "[t]he top certificate levels are completion certificate" which means that the participant "successfully completed the majority of the course requirements." There is also a participation certificate, which is awarded upon the participant "successfully completing the average amount of course requirements." There is an attendance certificate, which means the individual completed the "minimal amount of course requirements." Finally, there is also a noncompliance certificate which indicates that the participant "is failing to complete minimal amount of course requirements."

{¶36} Humrighouse testified that Mother and Father explained to her that the pair lived together but were no longer in a romantic relationship. Humrighouse stated that Mother had a boyfriend, and Father had a girlfriend, and that they planned on moving their respective partners into the home with them and C.P.

{¶37} Humrighouse testified that, at the time of the January 29, 2025 hearing, Father had not completed his Goodwill parenting skills training program, as his final day of class was scheduled for February 13, 2025. Humrighouse explained that Father had 2

Case No. 2025-P-0073

individual program goals in addition to 11 standard program goals that he and Mother were required to complete. Father's first individual program goal was to explain how he was responsible for "his involvement with Portage County and how he plans to provide a safe and stable environment for his child." There were several assigned tasks or bullet points for this program goal which requested Father to "explain the injury [C.P.] sustained and detail how it happened when you got her medical attention . . . explain why you continue to trap [C.P.] in her bedroom even after being told not to . . . explain what the home conditions were like at the time [C.P.] was removed . . . list what illnesses or injuries you can treat at home. List symptoms your child may display that require calling 911. List the steps you plan to follow in order to provide a stable and consistent environment for you and [C.P.] List the requirements you expect of a caregiver for [C.P.], and list who you would leave her with . . . list of concerns Portage County has with your ability to parent and any changes you have made to address those concerns."

{¶38}  Father's second individual program goal was to demonstrate his ability "to provide for [C.P.]'s basic needs, independently engage in active playtime, developing milestones during weekly visits."

{¶39}  Humrighouse testified that Father had not completed goal number one but had completed goal number two. Humrighouse testified that of the visits she observed, Father provided necessary food and clothing, engaged in playing with C.P., and encouraged C.P. to count and learn colors. Father and C.P. also shared hugs and kisses. Humrighouse stated that C.P. appeared bonded with Father. At the time of the January hearing, Humrighouse could not make a recommendation on unification in regard to Father as he had not completed the program.

{¶40} At the April 29, 2025 hearing, Humrighouse provided additional testimony. Humrighouse indicated that Father had completed the Goodwill program on February 13, 2025, and received a certificate of attendance. Humrighouse testified that a certificate of attendance would not be considered a successful completion of the program "because [Father] completed a minimal amount of course work." Humrighouse explained that Father completed 82 percent of his eleven program goals but that Father did not successfully complete the first of his two individual goals. Humrighouse noted that Father could not describe how he would properly address C.P.'s medical needs, and that he continued to insist that it was ok to "trap" C.P. in her bedroom all day with little interaction because there were cameras everywhere.

{¶41} Humrighouse testified that Father's responses to the domestic violence portion and the structured routine portions were not accepted. Humrighouse expressed concerns over Father's reliance on Mother for day-to-day care of C.P. When Humrighouse was asked if Father demonstrated if he could meet the needs of C.P. through the Goodwill parenting program, she stated, "I don't believe he could." Humrighouse testified that she did not recommend reunification for Father and C.P., stating "[i]t would not be in the best interest for [Father] to be [C.P.]'s primary caregiver or provide any unsupervised care."

{¶42} Tiffanie Goldner ("Goldner"), a PCJFS caseworker, also testified at the April 29, 2025 hearing. Goldner was assigned to work with C.P. as an assessment and investigative caseworker. Goldner testified that she investigated the initial concerns in C.P.'s case in December or January of 2022, and 2023, and again in August, September,

or October of 2024 as an ongoing caseworker. Goldner testified that C.P. was four when she began working with the family.[2]

{¶43} Goldner testified that she visited the family's home October 27, 2022 and made the following observations:

> Um, so [C.P.] was in the back of the home. There was a half-door on it at the time with an eye-and-hook lock. There was a camera pointed from the hallway to the room.
>
> However, because of the shape of the room and the design of the room you weren't able to see [C.P.] properly.
>
> She was – she had feety pajamas on, but the feet were cut out and they were put on backwards. When I asked [Mother] about this she advised it was because she kept taking her clothes off . . . . I tried to interact with [C.P.]. She didn't speak at all. She didn't really respond in a verbal way. However, when we did go in the room she was very excited to have somebody in there with her and spending time with her. I advised the parents this was a safety risk. . . . [C.P.]'s hair was also extremely matted. It was just – I don't know how to describe it. It looked like she hadn't been bathed in a while, and it was cut very, very short. When I asked what was going on with her hair, [Mother] had stated they cut it due to issues with allowing her to wash the hair and brush the hair, etc. . . . There was also a pillow and blanket on the floor. There was no bed, no mattress of any kind and various stuffed animals around along with a television in the corner.

{¶44} Goldner testified that Father told her he had an app for the camera, but that it was not operational at the time. Golder stated that the camera was outside of the room, "down the hall, closer to the living room than the bedroom."

{¶45} Goldner testified that after a follow-up visit on November 7, 2022, she still had concerns about the condition of the home and C.P.'s safety. Goldner testified that when she returned to the home, C.P. was locked in her bedroom again. Goldner testified

---

2. At the time of the hearing, C.P. was six.

Case No. 2025-P-0073

"there were zip ties around her shoulders so the cloth on her shirt was bunched, and I asked [Mother] why. She advised it was to keep [C.P.] from taking her clothes off again, and I asked, you know, what the engagement level was, if it had improved, and [Mother] stated she spends time with [C.P.] for about an hour when changing her diaper." When Goldner confronted Mother about the door being locked, Mother "began yelling, screaming, swinging her arms" at Goldner, and screamed at Goldner to get out. Goldner stated that Father was present during the visit but did not interact with her. Goldner stated that she had recommended in-home services for Mother and Father, but Mother declined.

{¶46} Goldner testified that after these visits, Rodkey was assigned as the family's caseworker. However, Goldner was reassigned in September of 2024. Goldner testified that when she first saw C.P. "[s]he appeared to be a shell of a person. There was no real light behind her eyes. It was almost like she was just existing. She didn't get excited for things. She wasn't happy. She just was very blasé, and I don't know how to describe it. It was heartbreaking." Goldner also described what C.P. was like after being placed in foster care. Goldner testified that C.P. is now potty trained and can communicate. Goldner stated: "[C.P.] laughs, she smiles. . . . When I saw [C.P.] for the first time after a significant break, between [Rodkey] having the case and coming back to myself, I didn't recognize her. I would have never know that was [C.P.] if somebody hadn't told me."

{¶47} Goldner stated that she had recently visited Mother's and Father's home. Goldner testified that her concerns for C.P.'s safety, if she were to return to the home, remained due to the home's condition. Goldner testified that "[y]ou know, [Father], really my concerns are his ability to truly understand. When asking him about like what he had learned at Goodwill, and this was obviously before he had finished the classes, it required

Case No. 2025-P-0073

a significant amount of prompting to inquire as to what he was learning." Goldner testified that Father was unable to remedy PCJFS's concerns during the nearly two years that C.P. had been removed from the home, stating "his goals were not met as far as, you know, in health and safety, different things like that, his level of understanding is still that of what it was in the beginning of this case for the concerns for locking [C.P.] in her room, her need to engage in services, so on and so forth."

{¶48} Goldner explained that during every visit with the parents she discussed what needed to be done to remedy the concerns. While the parents verbalized their understanding, the interactions suggested that the parents did not seem to understand [C.P.]'s needs. Goldner stated that it was hard to tell if C.P. had any bond with Mother or Father.

{¶49} Goldner explained that she had reviewed records regarding the termination of Mother's and Father's parental rights for C.P.'s sibling, J.W., in Stark County in 2015. Goldner also testified that PCJFS made attempts to locate family that might be able to take custody of C.P., but they were unsuccessful, stating that "[e]verybody that we did complete contact with declined." Finally, Goldner testified that she believed it to be in C.P.'s best interest to be placed into the permanent custody of PCJFS.

{¶50} Grabski, the GAL appointed for C.P., also testified. Grabski explained that she met with C.P., met with Mother and Father, observed supervised visits, and had spoken with the family's caseworkers, Rodkey and Goldner. Grabski testified that she received records from Goodwill, Dr. Thomas at Lighthouse, and had reviewed those records. Grabski testified that the last observed visit she had with the parents and C.P. was in December 2024. Grabski testified that she did not talk to any of the school

Case No. 2025-P-0073

personnel, mental health providers, or medical providers for C.P. Grabski further testified that she never visited the foster residence where C.P. was placed.

{¶51} Grabski observed C.P. while in the home with the parents two times prior to C.P.'s placement in foster care. Grabski observed C.P. and the parents at the visitation center between five and ten times. Grabski also testified that she believed it to be in C.P.'s best interest to be placed in the permanent custody of PCJFS.

{¶52} On May 13, 2025, a magistrate's decision was filed granting permanent custody to PCJFS. The trial court adopted the magistrate's decision on May 14, 2025. Objections to the magistrate's decision were filed by Father and Mother on May 22, 2025, and May 23, 2025, respectively.

{¶53} On July 23, 2025, Grabski filed a GAL report. On July 31, 2025, both Mother and Father, through counsel, filed motions requesting extensions of time to file supplements to their objections. The motions were granted on August 1, 2025. On August 7, 2025, Mother and Father each filed their memorandum in support of objections to the magistrate's decision. On August 15, 2025, PCJFS filed its response to Mother and Father's supplemental objections.

{¶54} On September 26, 2025, the trial court overruled Mother and Father's objections to the magistrate's decision and subsequently adopted the decision to terminate their parental rights. The trial court noted that Mother and Father specifically objected to the introduction of the GAL's report and testimony; and offered "only generalized" objections to the decision on the grounds that it was against the manifest weight of the evidence and contrary to the child's best interest. The trial court concluded that the GAL's January 23, 2025 report "failed to comport with the requirements of

Loc.R.26.06(H) and Sup.R. 48.06(A) as it only consisted of a single, four-sentence paragraph" and "fell below the minimum standard." However, the trial court found "no error" in the Magistrate's decision despite the obvious deficiencies of the GAL report. The trial court noted that the magistrate referenced the GAL report a single time regarding his findings under R.C. 2151.414(D)(1)(b) and that such reference revealed "that the [GAL] report and/or testimony had an extremely minimal effect, if any, on the Magistrate's ultimate conclusion." Furthermore, the court below found that neither Mother nor Father suffered any prejudice from the filing of the GAL report or from the testimony of the GAL. Indeed, the trial court found "the record ripe with competent, credible evidence to support the Magistrate's decision to grant permanent custody of [C.P.] to PCJFS even in the absence of the [GAL]'s report, testimony, and recommendation."

{¶55} The trial court also determined that Mother and Father's "generalized" objections to the magistrate's decision regarding the manifest weight of the evidence and the determination of the child's best interest, were not well taken as they failed to specifically state with particularly the grounds for the objections and failed to comply with the requirements of Juv.R.40. The court below further determined that the magistrate conducted a "comprehensive and thorough review of the evidence and testimony" and the decision was "well-supported with evidence that supports the award of permanent custody to PCJFS."

{¶56} Father timely filed his notice of appeal on October 20, 2025.[3]

## The Appeal

{¶57} Father asserts two assignments of error for review:

---

3. Mother also appealed from the trial court's judgment in Case No. 2025-P-0075.

Case No. 2025-P-0073

"[1.] THE TRIAL COURT'S DECISION TO GRANT PCJFS PERMANENT CUSTODY WAS AN ABUSE OF DISCRETION AS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."

"[2.] THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT GRANTED PERMANENT CUSTODY WHILE FAILING TO ENFORCE R.C. 2151.281."

## Manifest Weight/Sufficiency

{¶58} "Termination of parental rights has been described as 'the family law equivalent of the death penalty.'" *In re Hoffman*, 2002-Ohio-5368, ¶ 14, quoting *In re Smith*, 77 Ohio App.3d 1 (1991). However, "[t]he rights of a parent to his or her child, while fundamental, 'are always subject to the ultimate welfare of the child.'" *In re L.M.R.*, 2017-Ohio-158, ¶ 33, quoting *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). "[T]he termination of the rights of a natural parent should occur as a last resort . . . when necessary for the welfare of the child." *Id.*

{¶59} The Supreme Court of Ohio recently clarified the appellate court's standard of review for permanent custody cases under R.C. 2151.414 in *In re Z.C.*, 2023-Ohio-4703. In that case, the Court observed:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.
>
>  . . .
>
> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, . . . 2012-

Ohio-2179, . . .¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 . . . (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its effect in inducing belief'" (emphasis sic), *id*. at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, . . . 2007-Ohio-4918 . . ., ¶ 3, quoting *Thompkins* at 386, quoting Black's at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 11, 13-14.

{¶60} In Father's first assignment of error, he alleges that the trial court abused its discretion when it concluded that terminating parental rights was in the best interest of C.P. We disagree.

{¶61} Before granting permanent custody to PCJFS, R.C. 2151.414 requires that two prongs are met: "(1) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present and (2) that it is in the best interest of the child to grant permanent custody to the agency moving for custody. R.C. 2151.414(B)(1)." *In re G.C.M.G.*, 2023-Ohio-3018, ¶ 24 (11th Dist.).

{¶62} R.C. 2151.414(B)(1)(a) through (e) provides:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
>
> (e) The child or another child in the custody of the parent or parents from shoe custody the child has been removed has been adjudicated an abused, neglected, or dependent child

on three separate occasions by any court in this state or another state.

{¶63} If at least one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exists, the court must then determine by clear and convincing evidence that granting permanent custody is within the child's best interests. Here, the trial court determined that R.C. 2151.414(B)(1)(d) applied because C.P. was in the temporary custody of PCJFS for 12 or more months of a consecutive 22-month period. Father does not dispute this finding. Thus, the first prong pursuant to R.C. 2151.414(B) was met, and the trial court was then tasked with determining by clear and convincing evidence that granting permanent custody is within the child's best interests.

{¶64} R.C. 2151.414(D)(1) requires that the trial court, in determining the best interest of the child, must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶65} As this court has noted, "[d]etermining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "'all relevant [best interest] factors,'" as well as the 'five enumerated statutory factors.'" *In re B.R.H.*, 2025-Ohio-5181, ¶ 38 (11th Dist.) quoting *In re C.F.*, 2007-Ohio-1104, at ¶ 57, quoting R.C. 2151.414(D).

{¶66} R.C. 2151.414 does not require a court to give any of the best interest factors "greater weight or heightened significance." *Id.*, quoting *In re C.F.* at ¶ 57. When making its best interest determination, a trial court must consider the totality of the circumstances. *Id.* "In general, '[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security.'" *Id.,* quoting *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.).

{¶67} Father asserts that the trial court erred in its determination that permanent placement was in C.P.'s best interest. In the court below, Father's objection on these grounds consisted of a single, generalized statement. The trial court indicated that the generalized objection did not state with particularity, the grounds for the objection. Despite this conclusion, the trial court considered the general objections on the merit. On appeal, Father cites to each of the five enumerated factors in R.C. 2151.414(D)(1)(a)-(e). From the arguments in Father's brief to this court, it appears that Father takes issue with the trial court's determination as to factors (a) and (d).

Case No. 2025-P-0073

{¶68} In regard to R.C. 2151.414.(D)(1)(a), the interaction and interrelationship of C.P. with her parents, siblings, relatives, foster caregivers, and out-of-home providers, the trial court determined that C.P. "exhibited at least a minimum bond" with Father, "had no true bond with Mother," and was not bonded to any sibling. The trial court also concluded that C.P. was bonded with her current foster family. The trial court noted that C.P. had, since her placement with the foster family, began to meet "important developmental milestones."

{¶69} While not disputed by Father, R.C. 2151.414.(D)(1)(b) required the trial court to consider the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. The trial court noted that C.P. was six years old at the time of the permanent custody hearings and "not of sufficient age or maturity to express her wishes or concerns." At the time of removal, C.P. was four, nonverbal, did not know her name, and had not been enrolled in school. C.P. had been diagnosed with autism and could only talk in "short-word sentences." The trial court acknowledged that the GAL had recommended permanent custody but noted that such recommendation was just one factor a trial court considers in determining if permanent placement is in the best interest of the child.

{¶70} With regard to the custodial history of the child, as enumerated in R.C. 2151.414.(D)(1)(c), the trial court noted that C.P. was removed from the home and placed in the temporary custody of PCJFS on September 8, 2023. The court concluded that C.P. had been in the custody of PCJFS in excess of 12 of the past 22 consecutive months.

{¶71} With regard to R.C. 2151(D)(1)(d), the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a

Case No. 2025-P-0073

grant of permanent custody to the agency, the trial court determined that "[C.P.]'s need for a legally secure, permanent placement cannot be achieved without granting of permanent custody to PCJFS" and that "no appropriate relatives were available for the care and custody of [C.P.]" Finally, the trial court also determined that C.P. did not meet the criteria for a Planned Permanent Living Arrangement. The court below noted that while Mother and Father completed their case plans, Mother and Father were "not capable of initiating, let alone providing, permanency for a child with such profound needs as [C.P.]"

{¶72} Additionally, the court below determined that neither parent could provide a legally secure permanent placement of C.P. and that neither had remedied the concerns that led to C.P.'s removal. The trial court recognized the efforts of Father in completing most of their case plan objections, including participating in two separate parenting programs, the trial court determined that neither parent "was able to sufficiently demonstrate the level of dependability and critical thinking necessary to safely maintain [C.P.] under their care."

{¶73} The court below noted that at the time of removal, C.P. did not have a bed, she was still in diapers, she could not speak, and she had not received medical care for some time. Mother and Father were using baby gates to contain C.P. and were utilizing zip ties to keep C.P.'s clothes together and duct tape to secure C.P.'s diapers. While pursuing their case-plan objectives, Mother and Father made some improvements, including getting a bed for C.P., organizing her room, and having toys for her. However, the use of baby gates remained a concern. The court also noted that Father did not fully

appreciate the problems with his approach to parenting. The trial court recognized that this was due, in part, to the parents' own cognitive limitations.

{¶74} The final factor, R.C. 2151.414(e), requires consideration of whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. R.C. 2151.414(E)(11) provides:

> The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶75} The court below determined that R.C. 2151.414(E)(11) applied to Mother but made no similar finding as to Father.

{¶76} As observed previously, Father alleges that the trial court abused its discretion in finding that permanent custody is in the best interest of the child. We disagree.

{¶77} As noted above, Father seemingly takes issue with the trial court's determination as to factors (a) and (d). First, the magistrate's decision recognized that C.P.'s parents love C.P. However, Rodkey testified that C.P. and her parents were not bonded and that C.P. had a bond with her foster family. Humrighouse recognized that C.P. and Father had a bond. Despite the bond, after Father completed his parenting classes, Humrighouse did not recommend reunification. It is clear from the record the trial court considered the relationship between C.P. and Father. There is nothing to suggest

Case No. 2025-P-0073

that the trial court erred in its determination that the bond between C.P. and Father was minimal.

{¶78} Father next asserts that the trial court erred in its decision regarding the child's need for a legally secure and permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. The trial court recognized that Father completed his case plan; however, the completion of a case plan does not preclude a court from terminating a parent's rights. See *In re E.R.,* 2023-Ohio-1468, ¶ 45 (4th Dist.).

{¶79} The record is replete with testimony and evidence from multiple sources that the parents struggled to independently care for the child. While Father completed his parenting classes, he did not successfully complete the program, as he only earned a participation certificate. Moreover, it was clear from the record that Mother and Father required prompting from others to perform certain tasks and engage appropriately with C.P. It is also evident from the record and testimony that the parents failed to remedy the various concerns regarding the home. While some positive steps were taken, such as purchasing a bed and organizing the child's room, several concerns were not addressed. Despite Father's financial stability and his obvious love for C.P., Father was not equipped or able to give C.P. the level of care required to address her special needs.

{¶80} Humrighouse and Goldner each testified that they did not recommend reunification for Father and C.P., finding that it was not in the child's best interest. Additionally, Dr. Thomas opined that due to Mother's and Father's cognitive limitations, "it was going to make it . . . nearly impossible for them to independently raise a child with such profound needs . . . ." Furthermore, as there were no appropriate family members

Case No. 2025-P-0073

available to care for or take custody of C.P. or a type of placement that can be achieved without a grant of permanent custody to PCJFS, the trial court did not error in determining that it was in the best interest of C.P. to grant permanent custody to PCJFS.

{¶81} Upon review we conclude that the trial court's best-interest analysis and judgment is consistent with the manifest weight of the evidence. Accordingly, Father's first assignment of error is without merit.

### Deficient GAL Report

{¶82} In Father's second assignment of error, Father asserts that the trial court erred when it granted permanent custody of C.P. to PCJFS because the court failed to enforce R.C. 2151.281. Specifically, Father alleges that the trial court erred by admitting the GAL's testimony and by failing to replace the GAL as the GAL failed to perform her required duties and submitted a deficient report. Father requests reversal of the trial court's decision on these grounds. We disagree.

{¶83} A court must appoint a guardian ad litem "to protect the interest of a child in any proceeding concerning an alleged abused or neglected child and in any proceeding held pursuant to section 2151.414 of the Revised Code." R.C. 2151.281(B)(1). A guardian ad litem "shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court." R.C. 2151.281(I)

{¶84} The general responsibilities of a guardian ad litem include, but are not limited to, the following:

(1) Provide the court recommendations of the best interest of the child. Recommendations of the best interest of the child may be inconsistent with the wishes of the child or other parties.

(2) Maintain independence, objectivity, and fairness, as well as the appearance of fairness, in dealings with parties and professionals, both in and out of the courtroom, and have no ex parte communications with the court regarding the merits of the case;

(3) Act with respect and courtesy in the performance of the responsibilities of the guardian ad litem;

(4) Attend any hearing relevant to the responsibilities of the guardian ad litem;

(5) Upon becoming aware that the recommendations of the guardian ad litem differ from the wishes of the child, immediately notify the court in writing with notice to the parties or affected agencies. The court shall take action as it deems necessary.

(6) If necessary, request timely court reviews and judicial intervention in writing with notice to the parties or affected agencies;

(7) If the guardian ad litem is an attorney, file pleadings, motions, and other documents as appropriate and call, examine, and cross-examine witnesses pursuant to the applicable rules of procedure;

(8) Be available to testify at any relevant hearing. Attorneys who are to serve as both guardian ad litem and attorney in any dual appointments shall comply with Rule 3.7 of the Rules of Professional Conduct.

(9) If the guardian ad litem is not an attorney, avoid engaging in conduct that constitutes the unauthorized practice of law and be vigilant in performing the duties of the guardian ad litem;

(10) If the guardian ad litem is not an attorney, request the court to appoint an attorney for the guardian ad litem to file pleadings, motions, and other documents as appropriate and call,

examine, and cross-examine witnesses pursuant to the applicable rules of procedure. The court shall take action as it deems necessary.

Sup.R. 48.03(A).

{¶85} Additionally, Sup.R. 48.03(D) contains a nonexhaustive list of the duties of

a guardian ad litem which include:

(1) Become informed about the facts of the case and contact all relevant persons;

(2) Observe the child with each parent, foster parent, guardian or physical custodian;

(3) Interview the child, if age and developmentally appropriate where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other

Case No. 2025-P-0073

evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶86} Sup.R. 48.06(A) sets forth the requirements for a GAL's final report and provides in relevant part: "(1) A guardian ad litem shall prepare a written final report, including recommendations to the court" and "shall affirmatively state that responsibilities have been met and shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted, and all other relevant information considered by the guardian ad litem in reaching the recommendations and in accomplishing the duties required by statute, by court rule, and in the order of appointment from the court."

{¶87} This court has held that "'[t]he Rules of Superintendence are viewed as internal housekeeping rules which do not have the force or effect of procedural rules or statutes; accordingly, violations do not warrant reversal of a decision.' *In re C.H.*, [2019-Ohio-4316] at ¶ 39 [(11th Dist.)], citing *Allen v. Allen*, 2010-Ohio-475, ¶ 31 [(11th Dist.)]. . . . [T]he failure to comply with the Rules of Superintendence, even if a technical error, is not reversible." *In re K.L.*, 2021-Ohio-3080, ¶ 63 (11th Dist.). However, some appellate courts have found reversible error in "the extremely rare case involving exceptional circumstances such that the juvenile court's error, if left uncorrected, would challenge the fairness, integrity, and public reputation of the permanent custody parental termination judicial process." *In re A.S.*, 2022-Ohio-1861, ¶ 75 (10th Dist.). This is not an extremely rare case. Any error by the trial court regarding the admission of the GAL report does not

Case No. 2025-P-0073

challenge the fairness, integrity, or reputation of the permanent custody parental termination judicial process. *Id.*

{¶88} Grabski filed several GAL reports throughout the course of these proceedings: January 12, 2023, January 19, 2023, January 23, 2025, and July 23, 2025. Each of these reports was a single page in length.

{¶89} At the outset of the January 29, 2025 hearing on PCJFS's motion for permanent custody and Mother and Father's motions for legal custody, counsel for Mother and Father objected to the GAL's report and sought a continuance of the hearing so that the GAL could submit a new report. The magistrate denied the request noting that Grabski was present and available to testify. Grabski did not testify at the January 29, 2025 hearing, however she did make the following statements: "my report is not going to make or break this case . . . . It's also not a surprise to anybody . . . . Everybody is fully aware of what my recommendations have been throughout this entire case."

{¶90} While Grabski did not testify at the first hearing, she did testify during the second half of the hearing on April 29, 2025, and was subject to cross-examination, albeit briefly. At the hearing, Grabski testified that she met with C.P., the family, conducted home visits, observed supervised visits, had spoken with both case workers, reviewed records from Goodwill, and records from Dr. Thomas, and case plan objectives. After reviewing this information, Grabski testified that it was her recommendation that C.P. be placed into the permanent custody of PCJFS.

{¶91} On cross examination, Father's counsel inquired whether Grabski had spoken to any school officials, or mental health providers for C.P. Grabski testified that

Case No. 2025-P-0073

she had not. Grabski also testified that she had not observed C.P. at her current placement but observed C.P. and her foster caregivers at the visitation center.

{¶92} The court below concluded that the GAL's January 23, 2025 report "failed to comport with the requirements of Loc.R.26.06(H) and Sup.R. 48.06(A) as it only consisted of a single, four-sentence paragraph" and "fell below the minimum standard." However, the trial court found "no error" in the Magistrate's decision despite the obvious deficiencies of the GAL report. The trial court noted that the magistrate referenced the GAL report a single time regarding his findings under R.C. 2151.414(D)(1)(b) and that such reference revealed "that the [GAL] report and/or testimony had an extremely minimal effect, if any, on the Magistrate's ultimate conclusion." Furthermore, the court below found that neither Mother nor Father suffered any prejudice from the filing of the GAL report or from the testimony of the GAL. Indeed, the trial court found "the record ripe with competent, credible evidence to support the Magistrate's decision to grant permanent custody of [C.P.] to PCJFS even in the absence of the [GAL]'s report, testimony, and recommendation."

{¶93} Without question, the GAL report is subpar at best. However, Father had the opportunity to cross-examine Grabski and did so during the hearing. The trial court was well-aware that Grabski did not visit the foster residence, had not spoken with the school, or any mental health providers for C.P. The trial court could assign weight to the GAL's report in consideration of the motions for custody of C.P. The trial court made clear that its decision was not premised on the GAL's report. Indeed, upon review of the record, there was ample evidence presented to the trial court to determine that it was in the best interest of C.P. to be placed in the permanent custody of PCJFS, even absent the GAL's

Case No. 2025-P-0073

report. Any error in failing to enforce R.C. 2151.281 or the provisions in the Rules of Superintendence was harmless as the admission of the report did not affect the outcome of the case. Thus, reversal is not required. *In re A.A.*, 2024-Ohio-224, ¶ 56 (10th Dist.).

{¶94} Accordingly, Father's assignments of error lack merit.

**Conclusion**

{¶95} For the reasons set forth above, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-P-0073

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

Costs to be taxed against appellant.


JUDGE ROBERT J. PATTON


JUDGE EUGENE A. LUCCI,
concurs


JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-P-0073